| 58 | 1 |
|----|----|
| 111 | 33 |
| 58 | 1 |
| 117 | 191 |
| 58 | 1 |
| 121 | 534 |
| 58 | 1 |
| 134 | 288 |
| 58 | 1 |
| 149 | 375 |

THE PEOPLE OF THE STATE OF NEW YORK, Appellants, *v.* JAMES H. INGERSOLL, impleaded, etc., Respondent.

An action for money or property fraudulently or tortiously obtained or taken can only be maintained by the individual or corporation to whom the money or property belongs, either as general owner or as having a special property therein.

The State bringing a civil action for the recovery of money or property is within the general rule and can only recover upon proof of title or ownership. (CHURCH, Ch. J., and RAPALLO, J., dissenting.)

Whether the attorney-general, as the representative of and on behalf of the State, can, in virtue of its prerogative rights, except as authorized by the legislature, maintain an action against a municipal corporation and the officers thereof to compel a due execution of the public trusts, *quære.*

The doctrine recognized in England by which the attorney-general, in right of the prerogatives of the crown, may sue in equity to enforce the execution of property trusts by public corporations or the governors thereof, even if it prevails in this State, does not, nor do the principles upon which the adjudications in which it has been held proceed, authorize or sanction an action at law by the sovereign or the State to recover from a wrong-doer either money or other property belonging to a public corporation, or for damages for a fraud committed upon such corporation. Especially is this so when the wrong-doer occupies no fiduciary

or official relation to the corporation damaged. (CHURCH, Ch. J., and RAPALLO, J., dissenting.)

One who, by tort or fraud, becomes possessed of money or property can only be charged as involuntary trustee of the true owner. The State has not the rights nor the interests of a *cestui que trust*, except in respect of funds or property belonging to it as a corporate entity.

Where the right of money or property unlawfully obtained or taken and a right of action therefor exists in a public corporation, a concurrent right of action at law does not exist in the State, except when given by statute. The right of action at law is exclusive in the corporation. (CHURCH, Ch. J., and RAPALLO, J., dissenting.)

Under the Constitution and the laws of the State, by which the civil divisions thereof are created, a county is a public municipal corporation with power, as authorized and limited by law, to take and hold property for public use. Property thus held and owned is the property of the corporation, invested with the security of private or individual rights. The property is absolute, subject to the sovereign power of the State as exercised by the legislature. The county of New York is not an exception to this rule. (CHURCH, Ch. J., and RAPALLO, J., dissenting.)

Money realized from the sale of the bonds of a county, issued by authority of the legislature to pay existing debts of the municipality, and to be repaid from the revenues of the county or by taxes to be levied upon the taxable property of the county, is the corporate property of the county, and the county treasurer is the legal custodian of it until paid out pursuant to law.

All moneys raised by authority of law upon the credit of a county, and for which its corporate bonds have been issued and sold to *bona fide* purchasers, belong to the county in its corporate capacity, although the amount thus realized may, by reason of mistake fraud or official malfeasance, be in excess of the amount necessary to accomplish the full purpose contemplated by the legislative authorization. The excess is not the property of the State or recoverable for or payable into its treasury. (CHURCH, Ch. J., and RAPALLO, J., dissenting.)

The franchise of raising money for public use by tax or upon the credit of the municipality, conferred by the legislature upon a municipal corporation, is not exercised by the corporation as agent of the State; the relation of principal and agent does not exist between the State and the corporation. The former is neither entitled to the fruits of the franchise nor responsible for the acts of the municipality in its exercise. The State is merely inhibited by the Constitution from doing any act or passing any law tending to lessen the security or to impair the obligation of any contract which the municipality has, by authority of law, entered into. (CHURCH, Ch. J., and RAPALLO, J., dissenting.)

The legislature has the power to direct by what agency claims against a county shall be ascertained and adjusted, and by what officials the bonds of a county authorized to be issued to provide means of payment

therefor shall be attested and issued. But the bonds, when issued, are the bonds of the county by which its credit and revenues are pledged. The debt is the debt of the county and not of the State, and the moneys realized upon the bonds are the moneys of the county and not of the State; and when stolen or procured by fraud from the county treasury the county alone can maintain an action to recover the same, subject, however, like other municipal rights, to the control of the legislature. (Church, Ch. J., and Rapallo, J., dissenting.)

Accordingly *held* (Church, Ch. J., and Rapallo, J., dissenting), where a complaint in an action, brought in the name of the people of the State by. the attorney-general, alleged, in substance, that, pursuant to a corrupt and unlawful conspiracy between one of the board of auditors appointed by the act " to make further provision for the government of the county of New York" (§ 4, chap. 382, Laws of 1870) to audit certain liabilities of said county, and other persons, fraudulent and fictitious claims were procured to be audited, and, upon the strength of the certificates of audit, bonds of the county, as provided by said act, were issued to the amount of such claims, the avails of which were paid into the county treasury and drawn thence by the fraudulent claimants and divided among the conspirators, which sums so fraudulently obtained and appropriated were sought to be recovered: that such complaint did not state a cause of action in favor of plaintiffs as against one of the fraudulent claimants and conspirators, and that a demurrer thereto was properly sustained.

(Argued June 3, 1873; reargued February 11, 1874; decided June 9, 1874.)

Appeal from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order affirming an order of Special Term sustaining demurrer by defendant Ingersoll to plaintiffs' complaint.

This action was brought against William M. Tweed, Elbert A. Woodward, James H. Ingersoll and Andrew J. Garvey, to recover moneys alleged to have been wrongfully and fraudulently obtained and appropriated.

The complaint alleged, in substance, that, by an act of the legislature of this State (chap. 382, Laws of 1870), entitled "an act to make further provision for the government of the county of New York," it was enacted (§ 4) that all liabilities against the said county, previous to the passage of that act, should be audited by the mayor of the city of New York, the comptroller of the said city, and the then president of

the board of supervisors of the said county, and that the amounts which should be found to be due should be provided for by the issue of revenue bonds of the said county, payable during the year 1871; that the said board of· supervisors should include in the ordinance levying the tax for the year 1871 an amount sufficient to pay said bonds and the interest thereon, and that the claims on such liabilities should be paid by the said comptroller to the party or parties entitled to receive the same, upon the certificate of the three officers so required to audit in that behalf by the said act. That, at the passage of. said act, William M. Tweed was president of the board of supervisors of said·county. That after the passage of such act claims, purporting to be of the character aforesaid, were, in form, certified by the said three officers, amounting in the aggregate to $6,312,541.37. That the comptroller caused to be issued bonds, as prescribed by said act, in order to provide funds to pay the amounts so certified, and obtained from *bona fide* purchasers thereof $6,312,000, which last mentioned sum was, in formal compliance with the statutes and usual modes of official proceeding in said city, deposited in the National Broadway Bank of the city of New York to the credit of an account therein kept by the chamberlain of the city of New York, as county treasurer of the said county, by virtue of his official character as such chamberlain. That the said claims or liabilities were not examined or audited by the said board of auditors, or by any of them, and that but one meeting of such board was ever held, at which a paper was drawn up and subscribed by the three officers mentioned, in the following words :

" COMPTROLLER'S OFFICE, }
" *May* 5, 1870.

" The undersigned met as a commission under and by virtue of section 4 of chapter 382 of the Laws of 1870.

" On motion of the mayor, it is resolved that the county auditor collect from the appropriate committees of the board

of supervisors all bills and liabilities against the county incurred prior to April 26th, 1870, and amounts now due thereon, and that the evidence of the same be the authorization of the same by the said board, or its appropriate committees, on certificate of clerk or president, and that, thereupon, the said county auditor annex the vouchers to the appropriate blanks for our signature and action, as directed by the section aforesaid, and payment.

"A. OAKEY HALL,

"*Mayor.*

"WILLIAM M. TWEED,

"*Present President Board of Supervisors.*

"RICHARD B. CONNOLLY,

"*Comptroller.*"

That one James Watson was the person referred to in said paper styled the county auditor; that he acted upon the pretended accounts, in point of form authenticated as required, and attached certificates which were signed by the members of the board of auditors, separately, without investigation or consultation with the others, and thereupon, by direction of the comptroller, a warrant for the payment of each claim was prepared, signed by the comptroller and countersigned by the said mayor and one Joseph B. Young, as clerk of the board of supervisors, on which payment was made by the said bank for and on behalf of the said county treasurer. That the said accounts so pretended to be audited were false, fictitious and fraudulent, and were made up and prepared by fraud and collusion between the said James Watson, Andrew J. Garvey, James H. Ingersoll and Elbert A. Woodward, and put in such shape by certification thereof as to entitle the same, by the terms of said paper, to be audited and certified as aforesaid under the said act, without further investigation; and that after such accounts, respectively, had been certified to the said comptroller, as aforesaid, the said Watson obtained for each of them a corresponding warrant for payment, signed by the comptroller, countersigned by the

mayor and clerk of the board of supervisors, all of which were paid by said bank for and on behalf of the county treasurer, and that the payments were pursuant to a corrupt, fraudulent and unlawful combination and conspiracy to that end, by and between the said defendants and others, Tweed, Watson, Garvey, Ingersoll and Woodward, divided between the said Ingersoll, Garvey and Tweed, and sundry other persons to the plaintiffs and their attorney-general unknown.

The complaint originally contained various other allegations tending to show collusion on the part of the comptroller, mayor (who was also president of the board of supervisors) and others to prevent and suppress prosecutions for these frauds, and unwillingness on the part of the proper officers of the city or county to institute any action to redress the same. These allegations were, on motion of defendant Ingersoll, stricken out as to him.

Said defendant demurred to the complaint, upon the grounds, that plaintiffs had not legal capacity to sue; that the complaint did not state facts constituting a cause of action; that there was a defect of parties defendant, and that different causes of action were improperly joined.

Further facts appear in the opinion.

*Charles O' Conor, Samuel J. Tilden* and *Wheeler H. Peckham* for the appellants. By the law of England every public officer having the trust of the disposal, or application or custody of public property, is accountable for a breach of trust, in an action by the crown, represented by the attorney-general. (*Atty.-Genl.* v. *Brown*, 1 Swan., 255; *Atty.-Genl.* v. *Mayor, etc., of Dublin*, 1 Bligh [N. P. R.], 312; *Atty.-Genl.* v. *Mayor of Liverpool*, 1 Myl. & Cr., 171; *Atty.-Genl.* v. *Aspinall*, 2 Keene, 513; *Atty.-Genl.* v. *Aspinall*, 2 Myl. & Cr., 613; *Atty.-Genl.* v. *Wilson*, 1 Cr. & Ph., 1; *Atty.-Genl.* v. *Corp. of Poole*, 4 Myl. & Cr., 17; *Atty.-Genl.* v. *Eastlake*, 11 Hare, 206; *Atty.-Genl.* v. *Mayor of Belfast*, 4 Irish Ch., 119; *Atty.-Genl.* v. *Barret*, 3 Irish Eq., 392; *Atty.-Genl.* v. *Compton*, 1 Y. & Col., 411; *Parr* v.

*Atty.-Genl.*, 8 Cl. & Fin., 409.)   The right of the crown in England to intervene is a right by virtue of sovereignty, a prerogative right.   (*Atty.-Genl.* v. *Mayor, etc., of Dublin*, 1 Bligh [N. P. R.], 337, 347 ; 2 Myl. & Cr., 628, 633 ; 1 Cr. & Ph., 15, 20, 23, 26, 27 ; 4 Irish Ch., 142, 143, 156–158.)   The Supreme Court, as successor of the Court of Chancery, has jurisdiction to prevent and redress breaches of public trusts, coextensive with the Court of Chancery in England, in like cases.   (Chap. 280, Laws of 1847 ; 4 Edm., 560 ; 2 R. S. [Edm. ed.], 180.)   The attorney-general of this State has the same authority to represent the people in cases of breach of public trusts as the attorney-general has in England to represent the crown.   (1 Kent & Rad., 233 ; 1 Y. & Col., 427, 428 ; *Davis* v. *Mayor, etc., of N. Y.*, 2 Duer, 667 ; 14 N. Y., 528.)   The right of the people to intervene by action to restrain or redress a breach of public trusts has been recognized by inferior courts and judges, and, to some extent, by this court. (*Doolittle* v. *Suprs. of Broome Co.*, 18 N. Y., 163 ; *Roosevelt* v. *Draper*, 23 id., 318 ; *Wetmore* v. *Story*, 22 Barb., 447.) The supervisors of the county of New York have no legal capacity to sue for the redress of the breach of trust alleged, or for the recovery of the moneys in controversy.   (Const., § 2, art. 10 ; *Sheboygan Co.* v. *Parker*, 3 Wall., 96 ; Chap. 583, Laws of 1871, § 5 ; *Atty.-Genl.* v. *Wilson*, 1 Cr. & Ph., 23 ; Dunlap Paley on Ag., 279, 362 ; *Williams* v. *Millington*, 1 H. Black., 82 ; *Coppin* v. *Walker*, 2 Marsh, 500 ; *Taintor* v. *Prendergast*, 3 Hill, 72.)   The defendants were not responsible or accountable for their acts to any local body or corporation.   (*Lorillard* v. *Town of Monroe*, 1 Kern., 394, 395 ; *Sheboygan Co.* v. *Parker*, 3 Wall., 96.)   The county was not liable on the bonds, but was merely surety for the due levy of the State tax for their payment.   (*Blodgett* v. *M. and S. R. R. Co.*, 18 Wend., 28, 77, and cases cited.)   The county of New York has no general corporate capacity entitling it to sue in the premises.   (1 R. S., 364, § 3 ; *Brady* v. *Suprs.*, 2 Sandf., 460 ; 10 N. Y., 260 ; *Shoemaker* v. *Comrs. of Grant Co.*, 36 Ind., 183 ; 1 Kern., 395 ; *Reynolds* v. *Baldwin*, 1

Statement of case.

La. Ann., 167; *P. J. of Bossier* v. *Corp. of Shreveport*, 5 id., 667; *People* v. *Pinckney*, 32 N. Y., 392, 396; *People* v. *Kerr*, 27 id., 197; *State Bk. of Ohio* v. *Knoop*, 16 How. [U. S.], 380; reaffirmed, 18 id., 380, 384; *Robertson* v. *City of Rockford*, 21 Ill., 458; *Kittaning* v. *Brown*, 41 Penn., 272; *Hunsaker* v. *Borden*, 5 Cal., 290; *Comm.* v. *McFarland*, 7 J. J. Marsh, 208; *Schuyler Co.* v. *Mercer Co.*, 4 Gil. [Ill.], 20; *Jefferson Co.* v. *Ford*, 4 Greene [Iowa], 370, 371; *Hunter* v. *Comrs. of Mercer Co.*, 11 Ohio St., 520; *Harney* v. *Ind. R. R. Co.*, 32 Ind., 246, 247; *Matter of Flournoy*, 1 Kelly, 609, 610; *State* v. *Williams*, 1 N. & McC., 28; *State* v. *Casey*, 5 Wis., 322; *People* v. *Hurlbut*, 24 Mich., 81.) The certificate of audit created a perfect right, as against the tax-payers, to levy the tax. (*Lynde* v. *The County*, 16 Wall., 13.) The appropriate remedy is an action of tort by the State against its unfaithful agents or their abettors. (*Colchester* v. *Law*, L. R. [16 Eq. Cas.], 253.)

*William Fullerton, Elihu Root* and *David Dudley Field* for the respondents. The county of New York should be made a party to this suit in order that its rights may be protected. (Code, §§ 118–122; *Samuel* v. *Holliday*, Woolw., 400; *Shaver* v. *Bramin*, 29 Barb., 25.) The county can sue for any property which rightfully belongs to it, or for any injury to its property. (1 R. S., 364, § 1; 2 id., 473, § 92; *Jackson* v. *Hartwell*, 8 J. R., 425; *Todd* v. *Birdsall*, 1 Cow., 121, and notes; *Town of North Hempstead* v. *Hempstead*, Hop., 288; *Suprs. of Albany* v. *Durant*, 9 Paige, 82; 26 Wend., 66; *Wolf* v. *Suprs. of Bidwood*, 11 Abb., 270; *People* v. *Stout*, 23 Barb., 341; *Hill* v. *Suprs. of Livingston*, 12 N. Y., 52; *Davidson* v. *Mayor of N. Y.*, 2 Robt., 256; *McGarry* v. *Suprs. of N. Y.*, 7 id., 464.) Although the city and county of New York cover the same area or territory, the two governments are still distinct. (*Ableman* v. *Booth*, 21 How. [U. S.], 516; *The People* v. *County of N. Y.*, 5 Cow., 336; *Milhau* v. *Sharp*, 15 Barb., 229; *People* v. *Stout*, 23 id., 338, 339; *Mut. Benefit Life Ins. Co.* v. *Board of*

*Suprs. of N. Y.*, 2 Abb. Pr. [N. S.], 223; S. C., 3 Keyes, 182; 32 How. Pr., 359; *People ex rel. Wetmore* v. *Same*, 34 id., 379; S. C., 2 Keyes, 288; *People ex rel. Comrs. of Record* v. *Same*, 11 Abb. Pr., 114; *People ex rel. Hasbrouck* v. *Same*, 21 How. Pr., 322; *People ex rel. McSpedon* v. *Same*, 10 Abb. Pr., 233; S. C., 18 How. Pr., 152; *People ex rel. Hall* v. *Same*, 32 N. Y., 473; *People ex rel. Bk. of N. Y.* v. *Same*, 37 id., 21; *Brady* v. *Same*, 10 id., 260; *The People ex rel. N. Y. Mut. Ins. Co.* v. *Same*, 16 id., 424; *The N. Y. Life Ins. Co.* v. *Same*, 1 Abb. Pr., 250; *The Colonial Life Assurance Co.* v. *Same*, 4 id., 84; *The People ex rel. Mut. Life Ins. Co.* v. *Same*, 20 Barb., 81; *The Colonial Life Assurance Co.* v. *Same*, 24 id., 166; *The Mut. Benefit Life Ins. Co.* v. *Same*, 33 id., 322; *Sandford, President, etc.,* v. *Same*, 15 How., 172; *People* v. *County of N. Y.*, 5 Cow., 331; *Jansen* v. *Ostrander*, 1 id., 670; *Hill* v. *Suprs. of Livingston Co.*, 2 Kern., 52, 61; *Suprs. of Albany Co.* v. *Durant*, 9 Paige, 182; 26 Wend., 69; *People* v. *Stout*, 23 Barb., 338, 341; *Blake* v. *Suprs. of Livingston Co.*, 6 id., 149.) The money alleged to have been wrongfully obtained and divided belonged to the county of New York, and should be sued for by the county. (*People* v. *Opdyke*, 40 Barb., 306; Hoffman's Suprs., 26, 27, 328; *Newman* v. *Suprs. of Livingston*, 45 N. Y., 676, 687, 688; 1 Hoff. Laws, 500; 2 R. S., [marg. page] 474, §§ 104, 475; *Chapman* v. *City of Bklyn.*, 40 N. Y., 372.) The county of New York is the real party in interest. (Code, §§ 33, 111, 113; *People* v. *The Mayor*, 27 How. Pr., 34; *People* v. *Booth*, 32 N. Y., 398; *People* v. *Clark*, 53 Barb., 176; 1 R. S., 179, § 1; 2 id., 484; *Atty.-Genl.* v. *Utica Ins. Co.*, 2 J. Ch., 384; *People* v. *Miner*, 2 Lans., 396; *People* v. *A. and S. R. R. Co.*, 5 id., 26, 30, 32; *People* v. *Lowber*, 7 Abb., 175; *Bk. of Comm.* v. *Mayor*, 43 N. Y., 188; *Newman* v. *Supervisors of Livingston*, 45 id., 687.) There is a misjoinder of parties defendant. (*Hess* v. *B. and N. F. R. R. Co.*, 29 Barb., 391, 394; Code, §§ 7, 167.) The persons who obtained and received the moneys were

not agents of the State, but officers of the county of New York. (1 Hoff. Laws, 370; N. Y. Const., art. 10, § 2; id., art. 3, § 7; *People ex rel.* v. *Albertson*, Ct. of Apps., 1873; *People* v. *Tweed*, N. Y. O. & T., 1873.) The board of supervisors was the proper party to bring this action. (*People* v. *Edmonds*, 15 Barb., 529; 1 R. S., 83 [1st ed.], § 1; id., 364, §§ 1, 2; 2 id., 473, § 92; Const., art. 3, § 3; *People* v. *Tweed*, 13 Abb. Pr. [N. S.], 25, 73, 77; *People* v. *Edmonds*, 15 Barb., 539.)

Allen, J.   The history of this action, a fragment only of which is presented by the record before us, has been peculiar, and if the practice adopted is to ripen into a precedent may be regarded as unfortunate. Ordinarily, a judgment deliberately given upon a question directly in issue has been, and should be, regarded as the law of the particular case by other judges in subsequent stages of the litigation, until reversed upon appeal. In no other way can justice be duly administered, or the decisions of the courts command the respect of suitors and the public. Conflicting decisions by different judges, resulting in final judgments in the same action, each carried out to its legitimate results, necessarily leads to confusion; and indulged in to any great extent, will bring reproach upon the judicial system.

The principal question, and indeed the only question of importance that has, as yet, been presented to the courts, is as to the status of the plaintiffs and their right to maintain the action. That was first presented by the demurrer of the defendant first served with process, and the decision was for the plaintiffs, overruling the demurrer at Special Term, this was affirmed at General Term, the three justices sustaining their respective views in well considered and elaborate written opinions. This result was acquiesced in by that defendant who answered over, and the action stands for trial upon the issues of fact joined therein. Thereafter, upon the motion of the present defendant, about one-third of the complaint was, by order of another judge, stricken out as " irrelevant

and redundant," the allegations being claimed by the defendant, and held by the court, not essential either to the right of the plaintiffs, or the liability of the defendants, in respect to the cause of action stated. To the complaint, thus expurgated and pruned of what was regarded by the court below as superfluous and redundant statements, the present defendant demurred, and had judgment both at Special and General Terms, upon the ground that the plaintiffs had no standing in court, or right to maintain the action in respect to the matters and causes alleged. Thus two conflicting decisions have been given and are now operative, under one of which the plaintiffs, having a judgment affirming their right to maintain the action, the parties have put themselves upon the country; from the other, the present appeal has been taken. The precise question presented by this appeal may — if the matter stricken out by the court upon the application of the present defendant was, in fact, "irrelevant and redundant," in no way affecting the cause of action or the status of the plaintiffs, in case of a recovery by the plaintiffs — be presented upon an appeal from the judgment upon the issues of fact now ready for trial; and thus, if the practice is tolerated, several successive appeals from judgments and decisions, in different forms, may be brought in the same action by different parties, each presenting but the one and the same question. It is true, that the complaint has only been expurgated of the supposed redundant matter as to the present respondent, and as to the other defendants it stands as originally served; and the cause must proceed against them upon the facts alleged, so far as material to the right of the plaintiffs to sue, and upon the theory upon which the action was brought and the complaint framed by the learned counsel for the plaintiffs, and this constitutes another of the anomalies of this case. Whether the allegations and statements stricken out, as to this respondent, were or were not material, and might or might not be available to give the plaintiffs a right of action, is not before us upon this appeal; and no opinion is, therefore, expressed upon the question. It may be that if these allegations should

be sustained by proof, the case would be regarded as so essentially different from that presented by the demurrer before us, that the judgment in the one case would not control in the other. All possibility of conflict or successive appeals on the same question would have been obviated had the part stricken out been regarded by the court as redundant, as it had been adjudged, and the decision of the court first made adopted as the law of the case, irrespective of the individual opinions of the judges. In its present form, a very doubtful question is involved as to the right of the plaintiffs to appeal, there being no final judgment as to all the parties defendant. But in view of the magnitude of the amount, and the novelty and importance of the questions involved, and the serious embarrassments and possible loss that might arise from a dismissal of the appeal, I incline to forego the consideration of the question of practice, and consider the appeal upon its merits, as if no question existed as to its regularity. The action having been severed, as to this defendant, in the manner and by the proceedings before referred to, the demurrer of the defendant and the present appeal must be considered as if the present respondent were the sole defendant, and the action stood against him alone.

The appeal in the action, as it comes before us, does not involve the right of the State to maintain an action against the auditors or any of them for malfeasance in office, or any person occupying an official position and who has been faithless to his trust. The action is for the recovery of a certain sum alleged to have been obtained by the respondent and the other persons named in the complaint, his associates and confederates, by false and fraudulent means and devices, and by a corrupt and fraudulent combination and conspiracy. The gist of the action is, the obtaining by the defendant and others and appropriating to their own use a large sum of money, to which they were not entitled, by the false and fraudulent practices detailed, and the demand is for judgment for the amount alleged to have been thus obtained, with interest. It is not in terms averred that the

money, in any legal sense or in equity and good conscience, belonged to the plaintiffs, so that the defendants can be charged with the same as received to their use, or that the wrong was perpetrated directly against the State or the people of the State, that is, the whole State as a legal entity, and the whole body of the people; but the want of such averment it is claimed is supplied, and the necessity of such averment obviated, by allegations as to the source from which the money came, and the authority and agency by and purposes for which it was procured. The title to and ownership of the money sought to be recovered must determine the right of action, and if the money did not belong to the State, but did belong to some other body having capacity to sue, this action cannot be maintained. (*People* v. *Booth*, 32 N.Y., 397.) The eminent senior counsel for the plaintiffs, in his argument in the Supreme Court of the demurrer of another defendant, with copies of which we have been furnished, in answer to a question put as to " who did own the money," asserted that the State owned it, and, in substance, conceded that none but the true owner could have an action for its recovery. He says : " I believe I have answered the question, Who owns the money ? It is but another way of putting the question, Who can maintain the action ? Of course, the action ought to be maintained by the party who is regarded as the technical owner of the money, and the party so regarded in the law is the party to maintain the action." I have quoted this paragraph as expressing accurately and tersely the precise point upon which the right of the plaintiffs to sustain the action hinges, and it is in strict conformity with *People* v. *Booth* (*supra*). It may not be material whether the property in the money was absolute or qualified, general or special; but there must be an ownership of some kind to give an action. The party to maintain an action for a tort or wrong to property must be one whose property rights have been tortiously interfered with or invaded — one who, as trustee, special property man, bailee or general owner, has been pecuniarily damaged. The State cannot, any more than

an individual, have a civil action for the recovery of money, whether by way of damages for fraud or other wrong, the wrongful conversion of chattels, or for money received by and in the possession of others, except upon proof of title and ownership. A distinction is to be observed between actions by the people or the State, in right of the prerogative incident to sovereignty, and those founded on some pecuniary interest or proprietary right. The latter are governed by the ordinary rules of law by which rights are determined between individuals. A class of cases referred to and examined at great length by counsel do not call for an extended consideration if the title to the money fraudulently taken was in the county of New York, and an action lies at the suit of the board of supervisors in behalf of that county for its recovery. It is well settled in England that, in right of the prerogative of the crown, the attorney-general, in his name of office, may proceed, either by information or by bill in equity, to establish and enforce the execution of trusts of property by public corporations, to prevent the misappropriation or misapplication of funds or property raised or held for public use; and the abuse of power by the governors of corporations or public officers, or the exercise of powers not conferred by law, and, generally, to call upon the courts to see that right is done to the subjects of the crown who are incompetent to act for themselves. Ordinarily, the remedies sought have been preventive, but in some cases, as incident to the preventive and prospective relief, a claim has been made for retrospective relief, especially when the misappropriated funds could be traced and reclaimed in specie. The jurisdiction has been sustained upon the general principles of the right and duty of the court to grant preventive relief, and the relief actually granted, if any, in addition and as incident to that, has depended upon circumstances. The right of the attorney-general to intervene and the jurisdiction of the court was at first referred to the statute of Elizabeth concerning charitable uses and the trusts enforced as charities; later a public use, although not strictly charitable, was held within

the equity of the statute ; but a distinction was made as to the source from which the funds proceeded, and moneys, the avails of rates and taxes levied by act of parliament, were held not within the statute; but this distinction was soon ignored, and respect was had to the purpose for which property and funds were held, rather than their source and origin, in determining whether they were held for a public and charitable use within the jurisdiction of the Court of Chancery. Still more recently, courts have held that the statute of Elizabeth was not the source of the jurisdiction of the Court of Chancery, but that trustees of property for public use were always subject to the action of account, and that the Court of Chancery had concurrent jurisdiction with the courts of common law in compelling an accounting, and that by reason of the technicalities of the action of account proper in courts of law a court of equity afforded the better remedy of the two. The municipal corporation act of 6 William IV, chapter 76 has been referred to, but I do not understand that it affects the question as to the general jurisdiction of the Court of Chancery over public trusts at the instance of the attorney-general. It did make large classes of property held by boroughs and other municipal corporations trust property, and the corporation trustees of the same, which before had been held as the property of the corporations, unaffected by any trust, and as private property, but in no other respect affected the jurisdiction of courts of equity. The same principle has been held applicable to commissioners and other public officers clothed by parliament with power over property for a public use. In all the cases the action of the court was invoked against faithless trustees, and to compel a proper execution of the trust, and a right use of trust funds by those charged with their administration. A breach of duty or a violation of trust by the trustees, either actual or threatened, and impending, is at the foundation of every action by the attorney-general or the crown, or the people as sovereign, and essential to the right of either to maintain, as well as to the right of a court of equity to entertain jurisdiction of a suit,

by either touching property and funds held by public or municipal corporations for public use. If the property of a corporation be illegally interfered with by corporation officers and agents or others, the remedy is by action at the suit of the corporation, and not of the attorney-general. (*Attorney-General* v. *Brown*, 1 Swans., 265 ; *Same* v. *Heelis*, 2 S. & S., 67 ; *Same* v. *Eastlake*, 11 Hare, 205 ; *Same* v. *Mayor of Dublin*, 1 Bligh [N. P. R.], 312 ; *Same* v. *Mayor of Liverpool*, 1 M. & C., 171 ; *Same* v. *Wilson*, 1 Cr. & Ph., 1 ; *Same* v. *Corporation of Poole*, 2 Keene, 190 ; S. C., *sub nom. Attorney-General* v. *Aspinall*, id., 513, and 2 M. & C., 613 ; S. C., 4 M. & C., 417, and 8 Cl. & Fin., 409.) Decisions are cited from the reports of this country and of this State entitled to consideration and respect, affirming to some extent the doctrine of the English courts, and applying it to like cases, as they have arisen here. But in none has the doctrine been extended beyond the principles of the English cases, and aside from the jurisdiction of courts of equity over trusts of property for public uses, and over the trustees, either corporate or official, the courts have only interfered, at the instance of the attorney-general, to prevent and prohibit some official wrong by municipal corporations or public officers, and the exercise of usurped, or the abuse of actual powers. A case is not made by the complaint, within the doctrine contended for, or the cases relied upon, or within the reasons which lie at the foundation of the doctrine, and it is not necessary, therefore, to consider whether the doctrine to its full extent, or within what limits, if at all, is a part of the common law of this State, or whether it has been superseded or modified by statute. Doubtless, the prerogatives of the crown, except as affected by constitutional limitations, exist in the people as sovereign, but to what extent the exercise of this prerogative is committed to the public officials, either by the legislature or by the common law, is a question worthy of grave consideration, and not to be lightly decided, and should only be determined when necessary to a judgment and decision. Whenever the legislature, by statutory enactment, has

conferred upon State officers or public bodies authority to represent the body of the people in the exercise of any prerogative right no question can arise, for in those matters, except as restrained by the Constitution, the legislature is supreme. If there were no other remedy for a great wrong, and public justice and individual rights were likely to suffer for want of a prosecutor capable of pursuing the wrong-doer and redressing the wrong, the courts would struggle hard to find authority for the attorney-general to intervene in the name of the people. But, in the absence of such a necessity, the exercise of high prerogative powers ought not, by a species of judicial legislation, to be committed to the discretion of any individual or body of men. Such a committal of power should be the act of the legislature, who can hedge it about with all necessary safeguards. This action is not to establish or enforce a trust. The parties defendant are not, nor is either of them a trustee charged with any duty, or intrusted with the possession of funds or property to be administered by them for any public use. They are sought to be charged as tort feasors, for a consummated and completed tortious act.

The present respondent is not alleged to have occupied any official position, or to have owed any allegiance to the State or any of its civil or political divisions, except such as every citizen owes, and is not charged with having occupied any fiduciary relation to the city, county or State of New York, or to the funds of either. Unless the people of the State, or the State as a body politic or corporate, owned and were entitled to the money wrongfully abstracted, the defendant cannot be made a trustee for the State by reason of his tortious act; that is, he can only be charged as an involuntary trustee of the true owner of the fund. Only one of the other defendants had any official relation to the transaction detailed, and such relation was not that of trustee in any sense of any funds or property, or of the credit of the public. He, with others, was charged with certain specific duties, which did not include the possession, care or disposal of the

public funds or credit. These duties were' concluded long before the commencement of this action, and the complaint against him, so far as it touches his official action, is for malversation in the administration of his office or agency, by means of which large sums of money have been lost to the true owner, and appropriated by himself and others. Whatever other remedies the people may have to redress or punish this wrong, no precedent has been referred to for the maintenance of a civil action by the people to recover either the money lost or for compensatory damages, without proof of a right in the State as a political and corporate entity to the money as owner, and which would give it a place in the treasury of the State when recovered, or for some pecuniary damages sustained by the State, the compensation for which would of right belong to its treasury. The people, by the complaint, claim as owners, and do not seek to reclaim the money and compel its appropriation to any particular use or purpose. The claim of counsel, in their printed brief and upon argument, was, that it must be assumed that upon the recovery of the money by the State, and its reaching the State treasury the legislature would make such disposition of it as should be equitable and just, not claiming that there was any valid trust which could be established and enforced in equity. Such a shadowy and unsubstantial equity, depending upon the will and future action of the legislature for its recognition and establishment, is not the equivalent of, or substitute for, a trust of which the courts can take cognizance. In all the cases' of public or charitable use, established at the suit of the attorney-general or the State, the particular use has been averred, and without such averments the bill or information would have shown no equity, and the court would have been without jurisdiction. *Attorney-General* v. *Huber, Same* v. *Eastlake, Same* v. *Brown* (*supra*), are illustrations of the principles controlling the jurisdiction of courts of equity over individuals and public bodies acting officially in respect to property interests of the public. In all the cases the parties proceeded against, and

whose action was sought to be controlled or restrained, had the active administration of property or the power to raise and control funds dedicated or granted for public use, and their offices and duties were continuing, and respect was had in the relief sought to their future action. So the other cases referred to *supra*, of *Attorney-General* v. *Dublin* and *Same* v. *Liverpool*, are instances of the application of the principle, and the exercise of the jurisdiction against munici- palities having control and direction of funds and property for the public use. *The Attorney-General* v. *Wilson* (Craig & Phil.), differs from the others in this: that the borough of Leeds appeared on the record as relator and as a co-plaintiff with the attorney-general. The right of the corporation of Leeds to maintain the action was recognized and affirmed by the court; and it was said that the right of action, prior to the passage of the municipal corporation act of 6 William IV, was solely in that corporation, for the reason that the fund was the property of the corporation, and was only subjected to a trust and the jurisdiction of the court of equity as a trust fund by that act; and it was held that the corporation was a proper party to the action, its right of action not being destroyed, because, by the act, the attorney- general had a right to complain of a violation of the trust. In that case, as in the others, the foundation of the jurisdic- tion was an existing and continuing trust, and the object and purpose of the action was to compel the due execution of the trust, and for relief against a fraudulent misappropriation of the trust fund by former governors of the corporation and managers of the trust. But without further pursuing, in this connection, the consideration of the rights of the people of the State, and the powers of the attorney-general as their representative, to call the parties to an account for their mal- feasances, and to reclaim the money tortiously and fraudu- lently appropriated, the right of the county of New York to sue for and recover the money as owner and proprietor should be considered as the question primarily to be deter- mined, for in the absence of any fraud or collusion on the

part of the governing body of the county in the perpetration of the wrong and commission of the fraud, or any inability or disinclination of the proper officers of the county to prosecute, if the money was the property of the county, property belonging to its treasury, and the robbery and wrong was against the county, whether the money was held upon any particular trust, or was applicable to the general purposes of the county, or was incapable of use for county purposes, except by legislative permission, there would be no necessity or occasion for the intervention of the people or their attorney-general, as there might be if the authorities of the county — the trustees in fact — had been participants in the fraudulent abstraction of the moneys, or accessories to the frauds by refusing to prosecute. It is material to recall the fact that all the allegations of collusion, on the part of the county officers, in the perpetration of the fraud and wrong, and in the illusory prosecution of the offenders, as well as of any unwillingness on the part of the county or its corporate authorities to prosecute for the recovery, have been expunged from the complaint, as to this defendant. It would not be claimed that if the county has a cause of action and can recover the money (and there are no obstacles to an action by the county; and no omission of the officers of the county to bring an action) that the State can maintain an action for the same money. True, in some cases, as in the case of general owner and bailee, or principal and agent, either can, under certain circumstances, maintain an action for money or property or upon contracts; but these are exceptional cases, and this case is not within the exception or the reasons for it. There is no such or analogous relation between the State government and the counties of the State, and the general rule must apply, that a right of action for the same thing cannot, in the absence of legislation or some peculiar reason giving duplicate actions, exist at the same time in two independent corporations or individuals. For the wrongful conversion of money or property belonging to a municipal corporation, or for which it may have an action, there cannot be concurrent remedies

by the State and the municipality prosecuted *pari passu*.   If the State has a right of action it results from and as an incident of its sovereignty, and must, necessarily, be paramount to that of the subordinate body, and upon the exercise of the right by the State the right of the corporation must be suspended, and upon a recovery by the State the corporation be barred of its remedy.   Otherwise, a party may be vexed with two litigations, and possibly have two recoveries against him for the same cause of action.   I find no authority or precedent for thus depriving a municipal corporation of a civil and corporate right of action, and of property, in the discretion of the law officer of the State.   A county is not independent of the State, an *imperium in imperio*, but is in all things subject to the State and the legislature of the State, as sovereign, and its boundaries, its rights, privileges and powers may be enlarged or curtailed, and its property and property rights controlled from time to time, in the discretion of the legislature; but when grants, whether of rights or of power, are conferred by the legislature they are held absolutely, and to be enjoyed and exercised independently, subject only to the general laws of the State, the terms and conditions annexed to the grant, until withdrawn or modified by the legislature.   This is consistent with *The Town of Guilford* v. *Supervisors of Chenango* (3 Kern., 143), and *Darlington* v. *Mayor of New York* (31 N. Y., 164).   Chancellor Kent, in speaking of municipal corporations, says : " They may be empowered to take or hold private property for municipal uses, and such property is invested with the security of other private rights." (2 Kent's Com., 275.)   As remarked by Judge Denio, in *Darlington* v. *Mayor, etc. (supra)*: " This does not exempt such property from legislative control, and, in that respect, property rights stand upon the same footing as other corporate rights, whether political or civil.   Property owned by a city, county or other municipal or local government, is held by it as a public corporation and subject to the law-making power, and the governing body, by whatever name called and known, are merely trustees for the

public, who are the *cestui que trust* of the corporation. A municipal corporation is the trustee of the inhabitants of the territory embraced within its limits."

An effort has been made to distinguish the county of New York from the other counties of the State, in respect to its powers and corporate capacity, as one of the civil and political divisions of the State. But a brief consideration will serve to show, as was impliedly, if not expressly, conceded by counsel for the plaintiffs, that there is no substantial distinction: that is, no difference, between the organization and power of the county of New York and those of the other counties of the State which in the least affects the question under consideration. From the first, the State has been divided, for governmental and political purposes, into counties, and every part of the State has been incorporated into and embraced within the territorial limits of some county, and subjected to county government. Every Constitution of this State has recognized this fact, and made provisions consistent with it and based upon it. New York was one of the twelve original counties into which the State was divided by a law of the first legislature, held in the then colony of New York, on the 1st day of November, 1683. (2 R. L., 44, 45, 46.) The first charter of the city of New York granted after the treaty of peace of 1674, by which the English were reinstated in the possession of the colony, was by Governor Dongan, in 1683, although the charter of Governor Nicolls, of 1664, had been recognized, and corporate proceedings had under it from 1674 to the granting of the Dongan charter. (Hoffman's Treatise, 20.) From an early period, if not from the first, the boundaries of the city and county of New York have been the same. Perhaps at one period this was not so, but the fact is not material, and only of interest as a matter of local history. (See Hoffman's Treatises on the Corporation, appendix, xix, xx, xxi, notes 17, 18.)

From 1683 to the present time the county of New York has existed with substantially the same territorial limits as at

present, at all times having and exercising more or less of the political and corporate rights that were held and exercised by the other counties of the State. *By* reason of the coincidence of the boundaries and the constituencies of the two distinct organizations, the city and county of New York, and their common interests and sources of revenues, the county organization has been of less political importance than in other sections of the State, and the governing body has been differently constituted and has exercised less power. At times, many of the powers exercised elsewhere by the boards of supervisors have been devolved upon the common council of the city; and, duties ordinarily performed by county officers have been performed by city officials. It is not important to trace the changes that have been made from time to time, by some of which the distinction between the city and county government has been, to some extent, ignored. At no time has the county ceased to exist, and at all times a body has existed known as the board of supervisors of the county, who were the governing body of the county, exercising such legislative, administrative and corporate powers as the legislature has seen fit to intrust to it. To the extent that other special provision has been made by law for the performance of the functions in other counties performed by the boards of supervisors, the county of New York has been excepted from and not subject to the general laws affecting counties and prescribing the powers and duties of boards of supervisors. But in all other respects, the county has been subject to such general laws, and possessed all the powers corporate, as well as governmental, conferred by law upon the counties of the State. In 1857 a most material change was effected in the constitution of the county government, and from that time the functions of the governing body and the corporate powers of the county have been greatly enlarged, and the county government has more nearly assimilated to that of other counties. In that year, the controlling power in both branches of the legislature and the executive department of the State was in antagonism with the party dominant in the city and county of New York, and

either with a view to the better administration of the government of the county, or for the purpose of dividing the political power and the emoluments of office in the city and county of New York, provision was made for the government of the county by a hybrid body: that is, by a board of supervisors so chosen as to secure an equal number from each of the two political parties. As a reform in government the project was doubtless a failure; but as a means by which individual members of the two parties were enabled to combine and enjoy the luxuries of power, patronage and plunder, it has proved a perfect success.

It is probably true, that up to that time the county, as such, had but little, if any property, even that which was necessary for public use, but that circumstance did not affect its political existence or corporate capacity. A county may be absolutely destitute of all property and pecuniary means, and yet the political and corporate existence be as perfect and the corporate rights as complete as under any other circumstances. Very few of the counties possess any property, save the necessary lands and buildings for public use, and some, at an early day, may not have been the possessors of these, but their records may have been kept in the dwelling, store or office of the clerk charged with their custody, their courts held in a school-house, occupied by the sufferance and permission of the school trustees. But the county organization was none the less perfect by reason of the poverty of the county, or its imperfect preparation to perform all its functions. It suffices, for all the purposes of the present argument, that from 1857 to the passage of the law of 1870 the county, under the administration of a board of supervisors, did exercise many and large political, legislative and administrative powers, acquire property, incur pecuniary liabilities and perform other corporate acts under the sanction of law. The board of supervisors of the county of New York were not, certainly, during all that time distinguished from the boards of supervisors of other counties by the want of power or the opportunities for its exercise, although the powers were not in all

respects identical. The legislation which is the occasion of the present litigation recognizes and affirms the corporate existence and capacity of the county of New York as distinct from and independent of the city government, and as possessing all the essential powers conferred upon other counties ; and if there were no other foundation for the claim, that legislation would be sufficient to invest the county with all the attributes which pertain to a county organization and a municipal corporation, and bring New York within the provisions of the general statutes upon the subject of counties and their corporate rights and powers, except as otherwise specially provided by law.

The act (chap. 382 of the Laws of 1870), "to make further provisions for the government of the county of New York," distinctly recognizes the existence of a county, with every element of power and circumstance that can be claimed as necessarily incident to any other like organization. It directs the board of supervisors to cause to be raised by tax the sums of money necessary for the payment of the claims specified in certain sections thereof, after deducting from the aggregate amount of the claims the estimated revenues of the county; thus recognizing the existence of liabilities against the county, and the possession by it of property and sources of revenue other than the power of levying taxes. It also regulates the bringing of actions against the county, and section 4 is based upon the acknowledged fact that the county had incurred obligations and contracted debts, which were a county charge, to an amount so large that it was inexpedient to levy a tax for the payment of them at that time, and, hence, provision was made for borrowing money for that purpose. By the special provisions made for the audit and payment of the claims referred to, the legal right and obligations of the county were not essentially varied, or the relation between the State and county affected, or any new relation created between the State and the creditors of the county. A special process was devised and put in execution to meet a present necessity, somewhat different in detail from that provided by

general laws for the adjustment and payment of county charges, but the whole process was by and in behalf of the county as a corporate body, having the power to act for itself, and there was no special or general agency to act in behalf of the State. It was merely a grant of corporate power, modified and varied from that ordinarily conferred upon this and other counties, as made necessary by the peculiar circumstances; and to the limit of the power thus conferred the county was an independent individual agent, and the State, as such, was neither entitled to the fruits nor responsible for the consequences of the exercise of such power. The county was permitted to change the form of its indebtedness, but the indebtedness remained, as before, a county charge. The authority to borrow was conferred upon the county, and to be executed by county officers.

The special duty of auditing the claims was imposed upon the individuals designated by the act, but their duty ended with certifying the amounts of the several claims, and the county officials had no control of their action. The legislature might have fixed the sums and adjusted the claims in the statute, or authorized the amount to be determined in any other way, or by any other tribunal. To this extent, the county, in respect to this class of claims, was taken out of the general statutory provisions authorizing claims and charges against counties to be audited by the board of supervisors. (1 R. S., 366, § 4; id., 368, § 17.) Those individuals were not strictly county officers, neither were they State officers, but constituted a special commission for performing a service for and binding upon the county which is ordinarily performed by a county board, and which would seem to have been before then performed by the comptroller of the city, pursuant to the provisions of chapter 854 of the Laws of 1868. Precedent was found for a special board of audit for the adjustment of claims against the county of New York in chapter 806 of the Laws of 1867, constituting Chauncey M. Depew, Benjamin W. Bonney, Lewis B. Woodruff and John H. Martindale such board. Every other act, save the audit

of the claims, was to be performed, and was performed, by the county officials and in behalf of the county. The money was to be and was borrowed upon the bonds of the county, executed and attested by the proper officers, and paid by the comptroller to the proper claimants. The chamberlain of the city is by law made county treasurer, and all moneys belonging to the county, from whatever source derived, of right are received by him and disbursed upon proper warrants. (1 R. S., 370, § 29.)

By the act substituting the non-partisan board of supervisors for the former organization (Laws of 1857, chap. 590, § 6), the finance department of the city and its officers (of whom the comptroller is chief), are to have the like powers and perform the like duties in regard to the fiscal concerns of the board of supervisors, as in regard to the local concerns of the city ; and it is directed that no money shall be drawn from the treasury of the county except on the warrant of the comptroller, countersigned by the mayor and clerk of the board, thus making the comptroller and mayor *ex officio* county officers. The complaint, therefore, is strictly accurate in the averment that the moneys obtained from *bona fide* purchasers of the bonds, issued by the comptroller as prescribed by the act, were " in formal compliance with the statutes and usual modes of official proceeding in said city, deposited in the National Broadway Bank of the city of New York, to the credit of an account therein kept by the chamberlain of the city of New York, as county treasurer of the said county, by virtue of his said official character as such chamberlain." The comptroller was not a depositary or disburser of the public funds, and the act did not contemplate that he should receive and disburse the money. The brief direction in the act, that he should pay the claims audited, must be read in connection with the general laws defining his powers and prescribing his duties in respect to county matters, and as a county officer, or an officer charged with duties affecting the county. It was merely an authority, and a direction to draw a warrant upon the county treasurer in the

usual form, as was done in this case.   It was not intended to take these funds without the protection of the safeguards provided by law for all public funds.   Thus the funds were, as averred in the complaint, legally and properly paid into the county treasury as county moneys, to be drawn out only in the manner and upon the warrants authorized by law.   In the withdrawal of these funds all the forms of law were complied with.   The relation of the county of New York to these moneys, and its right as a municipal corporation to and over them, was precisely the same as would have been that of any and every other county in the State to moneys raised upon its credit, or in virtue of power conferred upon it for county purposes.   The question then is as to the rights of a county, as a public corporation, in respect to funds raised by authority of law upon its credit, and in the hands of its treasurer, and whether an action could be maintained by the county in any form for the recovery of the money, if tortiously or fraudulently taken from the county depositary or embezzled by him.

Corporate capacity is conferred upon each county in the State, and New York is not excepted, to sue and be sued, to purchase and hold lands within its limits, for the use of its inhabitants ; to make contracts and possess personal property, and to dispose of and regulate the use of its corporate property ; and all suits and proceedings by and against a county in its corporate capacity are directed to be in the name of the board of supervisors of such county, that serving *pro hac vice*, as the corporate name.   (1 R. S., 364, §§ 1–3 ; id., 384, §§ 1, 2 ; 2 id., 473, §§ 92, 95 ; *Supervisors of Onondaga* v. *Morgan*, 2 Keyes, 277.)   Counties are public, as distinguished from private corporations, and they are political as auxiliaries to the government of the State, and they are trustees of the people, the inhabitants within their county. (*North Hempstead* v. *Hempstead*, 2 Wend., 109.)   They are sometimes called *quasi* corporations, because not in terms declared by statute to be corporations, and have a corporate capacity only for particular specified ends.   But so long as they are invested with corporate

attributes, even if it be *sub modo*, the distinction is without a substantial difference within the limits of the corporate powers conferred. (2 Kent's Com., 278, 279; A. & A. on Corporations, § 23.) They are trustees only of the property held for public use. They are not the guardians and protectors of private and individual interest or property of the citizen. They may not intervene by action to protect or redress the individual citizen in respect to wrongs or injury to his person or property. Their power as well as duty is restricted to the protection and preservation of property possessed by them in their corporate capacity. (*Town of Guilford* v. *Supervisors of Chenango; Mayor of Georgetown* v. *Alexandria Canal Company*, 12 Peters, 91.) This trusteeship and corporate power, as a pecuniary and fiduciary relation, extends to and embraces not only the tangible property of the corporation, but the franchises and powers conferred for raising moneys and other means for the support of the local government and the use of the inhabitants of the county, and to the means realized from the franchises and powers conferred. It is immaterial whether the grant be of fees and emoluments from licenses, excise duties, rents or the like, or of a power to levy taxes or borrow money. The grant is a money grant by the State to the extent of the power conferred and the money realized under and by means of it. The pecuniary ability of a county may consist entirely, as it does ordinarily, in the power delegated to it to levy taxes or create a debt. The credit of the county, with granted power to use it, supported by the power of taxation delegated by the State, is a corporate right, and the fruits and avails of that credit, when exercised by the borrowing of money, are as much the property and rightfully belong to the treasury of the county as if the specific sum had been granted in terms and paid from any other source. In political and governmental matters the municipalities are the representatives of the sovereignty of the State, and auxiliary to it; in other matters, relating to property rights and pecuniary obligations, they have the attributes and the distinctive legal rights of private corporations,

and may acquire property, create debts, and sue and be sued as other corporations; and in the borrowing of money and incurring pecuniary obligations in any form, as well as in the buying and selling of property within the limits of the corporate powers conferred, they neither represent nor bind the State.

The relation of principal and agent does not and cannot exist, for obvious reasons, between the State and the various municipal corporations, created with power to contract debts in respect to the exercise of the corporate functions. Debts contracted by municipalities, by authority of the legislature, are contracted by them as principals and not as agents of the State. If this were not so, they would be clearly within the prohibition of section 12 of article 7 of the Constitution, but that they are not was decided in *People* v. *Flagg* (46 N. Y., 401). This agency must be established to entitle the State, without the direct sanction of the legislature, to claim or control the fruits and proceeds of the legal pledge of municipal credit, and from such agency, once established, necessarily and logically results the liability of the State for the debts incurred, and this in face of the explicit prohibition in the State Constitution against the direct and indirect creation of a State debt. The State cannot claim the benefits and repudiate the obligations resulting from the relation of principal and agent. The claim of the State to funds and moneys thus acquired cannot be rested upon the general sovereignty of the State and its rights and duties as *parens patriæ*. The State may, and must in some cases, care for and protect those who are incapable of caring for themselves, as infants, idiots and the like; but a corporation with full power to acquire and hold property, create debts, levy taxes and sue and be sued, with a competent board of governors, is not within this class of incompetents in need of the exercise of this nursing quality of the State government. Neither can I discern any just foundation for the claim of the State to these funds — that its action is necessary to the protection of the tax-payers of the municipality. The *cestuis que trust* of the corporate property consist of all the inhabitants within the territorial

limits of the corporation, including tax-payers and non-tax-payers; they are the corporators and their interests, as well the present as future inhabitants and corporators, are cared for and represented by the governing body for the time being as in other corporations. I incline to the opinion that money borrowed or raised by taxation for county purposes, and not wanted or used for the particular purposes for which it was raised, is applicable, by the action of the board of supervisors, to the payment of any county charge; but if this be not so, the want of power to appropriate it to public use, without legislative authority, does not work a forfeiture of the money to the State. It is not intended to deny the existence of plenary power in the legislature to direct the appropriation of any money in the county treasury to any use or purpose for the benefit of the inhabitants of the municipality. (*Darlington v. The Mayor, supra.*) The same objection might be taken to the right of the State, for if the moneys were once in the State treasury, it would require legislation to authorize their application or payment to any particular use. But whatever the legislature might do in the way of revoking a grant of power or of using or controlling the property of a county, no power in that direction has been conferred upon the attorney-general.

Much was said in the course of the argument of the position and rights of the tax-payers, and the impossibility of justice being done them, unless the State could by action recover and control the money in controversy. But the tax-payers, as distinguished from other inhabitants of the county, have no peculiar interests to subserve, or right to or interest in the money. The *cestuis que trust* of a municipal corporation are all the inhabitants within the territorial limits, whether taxable or not; and although the tax-payer may be more immediately affected pecuniarily by a maladministration of the corporate and trust funds, he has no rights except such as are common to all the inhabitants. One tax-payer for himself, or himself and all others, or all the tax-payers combined, cannot have an action for the correction or prevention of a misappro-

priation or misuser of the corporate property. (*Doolittle* v. *Supervisors of Broome County*, 18 N. Y., 155 ; *Roosevelt* v. *Draper*, 23 id., 318.) When the State, in the exercise of the taxing power, or any of the political corporations in the exercise of a delegation of the same power, has collected taxes pursuant to law, the amount levied has ceased to be the property of the tax-payers, and becomes corporate funds and money in trust for public purposes. The result is the same if the money is borrowed in anticipation of taxation and to be levied of those who shall hereafter become tax-payers. Neither the present nor prospective tax-payers have any special and peculiar interest in the fund, as distinguished from that of other citizens and subjects of the government, imposing the tax or incurring the debt. The borrowing of money to be repaid by taxation in the future is but one form of exercising the taxing power, and the character of the fund is the same, whether it has been collected of the tax-payer or borrowed upon the credit of the government, State or local. (*People* v. *Flagg*, 46 N. Y., 401.) For all governmental and public purposes, including that of levying taxes and borrowing money for public use, the corporation is regarded as perpetual, and no respect is had to the changing character of the constituency, and those liable to contribute to the support of the government or the payment of its debts. If, by mistake or error of any kind, taxes in excess of the amount required for present purposes have been, pursuant to law, collected they cannot be recovered back, unless there has been some irregularity or defect of jurisdiction, which vitiates the assessment and levy.

Neither is the money a waif belonging to the State, or any one who may chance to obtain possession of it, but it belongs to the municipal treasury, and is a trust fund for public use by the corporate authority. The result is the same if the money has been borrowed in excess of actual wants, and it is enough that a binding obligation has been incurred by the municipality to repay the money. Whether the obligation was incurred strictly pursuant to law is not important. If the

public corporation, having power to act in a corporate capacity, has, by its officers, so acted under the laws as to become bound by its obligation, the debt has become a corporate and a county charge, and the moneys, the fruits and proceeds of the obligation, are trust funds subject to the control of the governing body of the corporation under the general laws of the State. The validity of the bonds, which are represented by the moneys sought to be recovered in this action, is conceded by the counsel for the appellants, and if not valid the purchasers of the bonds are entitled to reclaim the money paid for them. If valid, they are the obligations of the county of New York, and the debt a county charge. The State is under no obligation to pay the bonds or to provide for their payment, except so far as a sovereign State is bound to act in good faith toward those who have acted and parted with their money on the faith of its laws and policy. The State cannot, in good morals, do anything to impair or diminish the ability of the county to pay the bonds at maturity. The only security the debtor has is the credit of the county, and the grant of power to the county with direction in the act to levy taxes for the payment of the debt. To this extent, the State may, perhaps, be regarded as contracting with those who have taken the bonds, and to have agreed that this grant of power shall not be revoked; but this does not create an obligation to pay the bonds. It only brings the transaction within the provision of the Constitution of the United States prohibiting States from passing any bill "impairing the obligations of contracts" (Constitution of the United States, art. 1, § 10), and makes the grant of power irrevocable. (*Hoffman* v. *Quincy*, 4 Wallace, 535.) It is claimed that the county cannot be sued upon these bonds and a recovery had. That the federal courts would sustain an action upon these bonds against the county can hardly be doubted, in view of the past action of those courts in similar actions. It has been held by the courts of this State, that for claims which by statute are made a county charge, and for the auditing of which provision is made by statute, counties can-

not be sued. (*Brady* v. *Supervisors of New York*, 10 N. Y., 260; *Martin* v. *Supervisors of Greene County*, 29 id., 645.) Conceding that the rule holds as to an absolute undertaking to pay a specified sum at a given day, it proves nothing, If .n action will not lie upon the bonds against the county, the holders have a perfect legal remedy by the writ of mandamus t.) compel the levy of the tax and the payment of the bonds, and whether the debt may be recovered by one form of civil procedure or another is not material. It necessarily follows, that this money being the fruits and avails of a burden, imposed pursuant to law upon the taxable inhabitants and property of the county of New York, for county purposes, of right belonged to the county of New York and its treasury, and the county has an action against any one who has by fraud or force become possessed of it.

It would hardly be claimed that if, after the avails of the bonds had been deposited with the county treasurer, the alleged frauds in the audit had been discovered and the warrants withheld, or payment had been refused by the treasurer, the State, by its attorney-general, without legislation, could have compelled the payment of the moneys into the State treasury, or recovered the money of the county treasurer. Neither would it be claimed that had the county treasurer embezzled the funds his sureties would not have been liable as for county moneys received by him. Had the bonds been delivered to a purchaser without actual payment of the money, any proceedings for a recovery of the bonds or the purchase-price would, necessarily, have been by the county. The fact that a larger sum was borrowed than was required to pay the just claims against the county, by reason of a fraud in the audit, does not, in my judgment, affect the question. The money has been raised, properly or improperly, upon the credit and at the expense of the county and for its use, to be repaid by it. The wrongful act of the public agents does not give to the State the rights and impose upon it the obligations of a principal in the transaction. Had only just claims been audited and allowed, and the precise amount required for their pay-

ment been raised, and that had been taken by force or fraud from the possession of the county treasury, the legal rights of the county and the relation of the State to the transaction would have been precisely the same as now, and yet the right of the county to maintain an action for the money would not in the case supposed, have been doubted. The county would have been the rightful possessor of the money and the proper party to an action for its recovery. (*Van Keuren* v. *Johnston*, 3 Denio, 183 ; *Supervisors of Albany County* v. *Durant*, 9 Paige, 182.) The reversal of the decree in this case by the Court for the Correction of Errors (26 Wend., 66) was upon a ground not affecting the right of a board of supervisors to maintain the action, if a cause of action had existed.

If any county of the State should, by authority of law, levy by tax or borrow upon the credit of the county and a pledge of taxes to be levied in the future, a sum of money for the building of a court-house or other special purpose, no one would doubt the title of the county to the money so long as it remained unexpended in the hands of the county officials, or its right of action for the recovery of it, if it should be tortiously taken or embezzled. If there should be a surplus remaining of the same money after the accomplishment of the special purpose for which it was raised, and it should be fraudulently or tortiously appropriated, the property of the county in such surplus, and its right of action to reclaim it, to the exclusion of the State and every other corporate body, would not be questioned. This case does not differ in principle and cannot be distinguished from that supposed. But for the importance given to it by eminent counsel, I should not regard the source from which the money came as a controlling, or even an important element in determining by whom the action should be brought. It was in the county treasury, and was paid from the treasury as alleged, and received by the defendant as the money of the county, upon a claim against the county ; and if such claim was fraudulent and the pretence, under which the money was obtained false, the defendant is necessarily liable to the county, either in an

action for the fraud or for money had and received, and is estopped from denying the title of the county to the money, or its right to reclaim it, if in fact it was falsely and fraudulently obtained. These considerations lead to an affirmance of the judgment of the Supreme Court.

While in view of some of the circumstances connected with the origin and history of this suit we might wish, for the purposes of this action, the law was different, we can but declare it as we find it. There is nothing in the transaction itself, or facts alleged in the complaint, to distinguish this case, in principle, from any other in which the funds and property of a county have been embezzled, stolen or tortiously appropriated, or tending to show that the right of action and remedy which would exist in such case in any county of the State, are not vested in or do not belong to the county of New York, in respect to the wrong complained of here. Neither is it averred in the complaint that obstacles, in any form, exist to the prosecution of such remedy by the county, or that the corporate authorities have not prosecuted, or will not and cannot effectually prosecute for the alleged wrong.

Were it believed that the remedy by and in behalf of the county was not plain, palpable and free from all doubt, we might hesitate in giving the judgment to which our examination has led us, lest a flagrant wrong might go unpunished. It was conceded by counsel for the plaintiffs, upon the first argument of this appeal, that the same reasons do not now exist for maintaining an action by the State, rather than the county, that were supposed to exist at the time of the commencement of this action. Reference was, doubtless, had in such suggestion, to the statements of the complaint stricken out by order of the court below, acquiesced in by the plaintiffs, tending to show collusion between the county officials and the wrong-doers, and the difficulties by reason of such collusion and complicity, in the way of an effective prosecution of an action by the county. Those statements are not now in the record, and the position and relation of the pres-

ent government of the county to the defendants is supposed to have been changed. Whether this be so or not is not material upon this appeal, as the record discloses no fact which will take this action or cause of action out of the general principle governing all like cases. It will not answer to ignore well established rules of law and invent new principles and modes of procedure solely by reason of the magnitude of a claim or the enormity of a wrong, so long as there is a party in whom the cause of action is vested, able and willing to prosecute, and established rules of law and familiar modes of procedure give an ample remedy to enforce the right and redress the wrong.

To sustain this action upon the ground that the individuals acting in the transaction, under the statute, were State agents and not the agents of the county, would lead to serious results, and greatly embarrass the State in respect to the many millions of municipal obligations which have been incurred under legislative authority, only differing in the form and method of execution from that exercised in this case. The State cannot make the actors State agents without assuming the position and responsibility of principal, especially, if the agency is, as is claimed here, of a character entitling the State to the fruits and benefits of the agency. To sustain the action upon the ground of State sovereignty, and a general State guardianship over municipal corporations and their rights and property interests, without legislation upon this subject, and hold that for an invasion of the property rights of a public corporation an action will lie in the discretion and at the instance of the attorney-general, in the name of the people, to the exclusion of or concurrent with a like right of action in the corporation damnified, would introduce a new and strange doctrine, subverting those by which the rights and obligations of that class of corporations have been governed, and lead to confusion and embarrassment in the future, in the administration of the affairs and redressing of wrongs to the property rights of municipal corporations. The right to bring actions for injuries to their property is

expressly conferred and given to counties by statute, and this necessarily excludes the right of the State to bring an action for the same cause. It is not intended to deny that a case may be made in which the attorney-general may, in the name of the people, institute and maintain an action against a wrong-doer, and the public corporation whose rights have been invaded or threatened, and the governing body of such corporation, to enforce a right, or redress a wrong, or prevent a breach of trust, where the governing body is faithless to its trust or a party to the wrong. Such a case is not made here, and the question is not before us.

The judgment should be affirmed.

RAPALLO, J. (dissenting). The main question in this case is, whether upon the facts stated in the complaint, admitting them to be true, the State is the proper party to maintain this action.

By an act of the legislature, passed on the 26th of April, 1870 (Laws of 1870, chap. 382, § 4), it was enacted as follows:

"All liabilities against the county of New York, previous to the passage of this act, shall be audited by the mayor of the city of New York, the comptroller of said city and the present president of the board of supervisors; and the amounts which are found to be due shall be provided for by the issue of revenue bonds of the county of New York, payable during the year 1871, and the board of supervisors shall include in the ordinance levying the taxes for the year 1871 an amount sufficient to pay said bonds and the interest thereon. Such claims shall be paid by the comptroller to the party or parties entitled to receive the same upon the certificate of the officers named herein."

The complaint alleges, in substance, that the auditors appointed by this act, between May and September, 1870, certified claims purporting to be of the character described in the act, in favor of the defendants Ingersoll, Garvey and others, to the amount of several millions of dollars, upon

which certificates revenue bonds of the county were issued in proper form by the comptroller as prescribed in the act, and money was raised thereon from *bona fide* purchasers thereof, in order to pay the amounts so certified ; that this money was deposited in a bank to the credit of an account then kept by the chamberlain of the city of New York, as treasurer of the county, and was afterward obtained by the defendants Ingersoll, Garvey and Woodward, by means of comptroller's warrants drawn upon the bank for the payment of the claims certified as aforesaid.

That the defendant Tweed was, at the time of the passage of the act of April 26, 1870, president of the board of supervisors of the county of New York, and, consequently, one of the persons by that act appointed auditors ; that he assumed to act as such auditor, and that, in that capacity, he, as well as the other auditors named in the act, signed certificates of the audit and allowance of the alleged claims which served as the foundation for the issue of the revenue bonds upon which the money in question was raised. That these claims were never, in fact, audited by the board appointed by the act of April 26, 1870, but that the certificates of the audit thereof were signed by the auditors separately and without investigation, in pursuance of a resolution adopted by them on the 5th of May, 1870, whereby the county auditor (then one James Watson) was directed to collect all bills and liabilities against the county incurred prior to April 26, 1870 ; and it was resolved that the evidence of the same should be the authorization of the same by the board of supervisors, or its appropriate committees, on certificate of the clerk or the president.

The complaint then proceeds to allege that the accounts so pretended to have been audited were false, fictitious and fraudulent, and were prepared by fraud and collusion between the said Watson (then county auditor) and the defendants Garvey, Ingersoll and Woodward, and put in such shape as to entitle them, by the terms of the resolution of the board of auditors, dated May 5, 1870, and before mentioned, to be certified under the act of April 26, 1870, without further

investigation ; that after they had been so certified, Watson obtained the comptroller's warrants for their payment, and that the sums paid on such warrants were, "pursuant to a corrupt, fraudulent and unlawful combination and conspiracy to that end by and between the said William M. Tweed, James Watson, Andrew J. Garvey, James H. Ingersoll and Elbert A. Woodward, agreed to be divided and were divided between the said James H. Ingersoll, Andrew J. Garvey and William M. Tweed," and other persons unknown, etc. The details of the transactions are set out in the complaint and schedules, and it sufficiently appears that these payments were made out of the fund raised by the sale of revenue bonds, issued on the strength of the certificates of audit signed by the auditors appointed by the act of April 26, 1870.

These facts, which are admitted by the demurrer, establish that the State, through its legislature, provided a method of discharging a specified class of the liabilities of one of its counties. That it appointed certain persons to carry out its enactments by auditing the liabilities, issuing bonds for the precise amount necessary to pay such liabilities when ascertained, and applying to such payment the proceeds of the bonds so issued. The State provided for the payment of these bonds by requiring the board of supervisors of the county to raise by taxation the amount necessary to pay them.

The auditing of the claims was intrusted to three persons, not as county officers, but as special appointees of the legislature to carry out the provisions of the act. They were the mayor and the comptroller of the city of New York and the *then present* president of the board of supervisors of the county. His powers and duties as auditor did not depend upon the continuance of his office of president of the board of supervisors. Instead of being personally named he was described in the act as the then president of the board. This was a mere designation of the person intended. He continued auditor, notwithstanding the termination of his office of president of the board of supervisors, which, as is alleged in the complaint, occurred on the 4th of July, 1870. From the

beginning he acted, not in virtue of his county office, but as the repository of a special trust directly confided to him by the legislature, and, together with the mayor and the comptroller of the city, formed a commission appointed by the State for the performance of a special duty. This duty consisted in auditing and certifying the amount of the liabilities of the county up to a certain date, and, consequently, determining the sum which should be levied upon the taxpayers for the purpose of meeting those liabilities. The liabilities were not to be paid out of any fund, property or revenue of the county, as such, but, ultimately, by means of the tax which the supervisors of the county were, by the act, required to levy for that special purpose in the following year, 1871. In order to obviate delay in the discharge of the liabilities in question a means was provided for discounting or anticipating the tax so authorized by the issue of the bonds before referred to, and the amount necessary to pay those bonds was to be raised by the tax.

The controlling question arising upon this demurrer is, whether for any fraud, misconduct or breach of trust on the part of any of the persons designated by the legislature for the purpose of carrying into effect the provisions of this act, which fraud, misconduct or breach of trust has resulted in raising upon temporary bonds, issued in the form authorized by the act, a vastly larger sum than was necessary for the discharge of the liabilities provided for by the act, and in transferring the surplus into the pockets of the delinquent agent or appointee of the State, and other persons confederating with him to that end, an action will lie on behalf of the State against the delinquent and his confederates who have participated in the corrupt transactions and their fruits.

One material inquiry in determining this question is: Upon whom will the loss occasioned by these transactions fall? There can be but one answer to this question. The bonds have been disposed of to *bona fide* holders. They are directed by law to be paid by means of a tax, to be levied on the tax-payers of the county. The bondholders have the legal right to

enforce the levy of this tax. There is no property of the county as such, out of which these bonds can be collected by legal process. The moneys, therefore, which have been fraudulently raised upon these bonds and appropriated by the wrong-doers, will have to be collected under authority of the State, out of the tax-payers of the county, and the loss, consequently, falls upon them.

It is clearly shown by the authorities cited in the argument, that no individual can have a standing in court as a tax-payer merely, for the purpose of obtaining redress for such a wrong; and the reasons for this conclusion are too obvious to render discussion necessary. Among other reasons, as is evident in the present case, it would be impossible to ascertain the extent to which any individual, who was a tax-payer at the time of the wrong, would be damnified, or even that he would be a tax-payer when the time should arrive for the levy of the tax. Who, then, is the proper party to appear as plaintiff, and represent the fluctuating body of tax-payers who, sooner or later, must be compelled by authority of the State to pay the money wrongfully obtained by the defendants on the credit of the tax to be imposed?

The people of the State, through their attorney-general, appear before the court, claiming the right to intervene as plaintiff, and to compel their own unfaithful appointee and trustee, and those who have combined, conspired and shared with him, to replace the moneys which, under color of the authority conferred by the State, they have thus wrongfully obtained and applied to their own use, or to pay in the form of damages such sum as will compensate for the amount which by their wrongful acts they have obtained at the expense of the tax-payers.

It must be conceded that the question presented is novel; but the law is not so defective as to be wholly destitute of remedy in such a case. The remedy required is, in the first place, to take out of the hands of the wrong-doer the fund which they have unlawfully obtained,

or to compel them to pay an equivalent in the form of damages. The disposition of the money which the defendants may be adjudged to pay is not provided for by any existing law, and it is therefore impossible for the court now to· adjudicate what shall be its final destination. That the defendants are not entitled to retain it, and that they are liable in some form for the wrong committed in obtaining it, cannot be questioned. That justice requires that such disposition shall ultimately be made of .the money to be recovered as will relieve *pro tanto* the tax-payers who will ultimately be subjected to the payment of the obligations upon which the money was wrongfully raised, is obvious. But in the absence of any machinery provided by law for a case so extraordinary the court should not undertake, whoever is plaintiff, to do more than to require that the avails of the recovery be placed in the treasury of the State, or other safe custody, to await further legislation.

Assuming the correctness of these propositions, which will be further substantiated in connection with the objections raised by the demurrant, it would seem sufficiently plain that the State is a proper party to invoke such a remedy as this case demands. The wrong complained of is the violation by an agent or appointee of the State of a trust and duty created by statute, for a special purpose, through which violation of duty he and the other defendants, confederating with him, have obtained a large sum of money on obligations which must be paid by taxation under authority of the State. The damage resulting ·is to the fluctuating body of tax-payers of one of the divisions of the State, who, under the provisions of the Constitution of the United States, cannot be liberated from the burden to which the acts of the defendants have subjected them, by any means short of the State itself assuming and paying the bonds, the proceeds of which the defendants have wrongfully appropriated. On no other terms could any repeal of the act directing the levy of the tax be sustained. The money which the defendants ought to replace will, by whomsoever recovered, be subject to the control of the

legislature. Even if recovered by the State and paid into the general fund, legislation will be required for its appropriation to any particular object.

Unless it can be shown that under existing statutes some particular officer or body is vested with the exclusive power of bringing the action in such a case, the interest of the people ought to be deemed sufficient to entitle them to intervene for that purpose, through their attorney-general, who is, by statute, not only empowered, but required to prosecute all actions in the event of which the people are interested. (1 R. S., 179, § 1.) It seems to be conceded, in all the discussions upon the subject before and within the court, that if the attorney-general had been specially authorized by act of the legislature to bring this action, such authority would be valid and sufficient to sustain the action. This proposition necessarily concedes the interest of the State in the subject of the litigation.

If a special authorization in the particular case would have been sufficient to require the court to entertain the action of the attorney-general, on what principle can it refuse to do so in the face of the general statute, which not only empowers but requires him to prosecute all actions in the event of which the people are interested? Ordinary reasoning would lead us to the conclusion that this general statute is sufficient authority for his intervention in any such case, unless some special statute is pointed out which restrains his action in the particular case, or grants the exclusive right to prosecute such action to some other officer or local body. No such statute has been pointed out, nor have I found any.

The cases in this State which deny the right of individuals to intervene, simply on the ground that they are tax-payers whose burdens will be increased by the wrong complained of, proceed upon the ground that the general rule is, that for wrongs against the public, whether actually committed or only apprehended, the remedy, whether civil or criminal, is by the State in its political character, or by some officer authorized by law to act in its behalf; and this is true whether

the whole people of the State or only those of a particular locality are affected. Common nuisances, purprestures, usurpations of public offices and the improper exercise by public officers of their functions, are recognized as instances of the application of this principle. The inconveniences which would result from any other principle — among which is the multiplicity of suits which would arise — are pointed out in those cases. No private person or number of persons can assume to be the champions of the community, and in its behalf challenge the public officers to meet them in the courts of justice to defend their official acts. *Their remedy is to invoke the action of the officer whom the law has appointed to sue in such cases.* (*Doolittle* v. *Supervisors of Broome County*, 18 N. Y., 163; *Roosevelt* v. *Draper*, 23 id., 318.) In the case last cited, Judge DENIO, in delivering the opinion of the court, declares that, " an act of administration likely to produce taxation is not a matter of private or individual concern ; it is an affair altogether public ; and the only remedial process against an abuse of administrative power, tending to taxation, which we can have, is furnished by the *elective system, or a proceeding in behalf of the State.*"

The grounds upon which the right of the State to prosecute the action is denied are, that the money which was taken by the defendants belonged to the county of New York. That the supervisors of every county are empowered by statute to bring actions to enforce liabilities to the county and to recover damages for injuries done to the property or rights of the county (2 R. S., 473); and that, consequently the action should have been brought by the supervisors of the county of New York. No other party is suggested as the proper plaintiff.

Assuming that the provisions authorizing supervisors of counties to bring actions are applicable to the county of New York (a proposition which is denied by the appellants), it is necessary to this defence to establish that the liability incurred by the defendants was to the county, or that the money taken by them was the property of the county. The only cases in which the supervisors of a county are empowered by

statute to sue are those before mentioned, together with some others which are foreign to the present case, such as actions on contracts made with the supervisors, for penalties and forfeitures, etc. (2 R. S., 473); and a county can neither sue nor be sued except by express power conferred by statute. (*Hunter* v. *Comrs. Mercer County*, 10 Ohio St., 520; *Hunsaker* v. *Borden*, 5 Cal., 290.)

It is worthy of remark, in passing to the consideration of this defence, that so far as appears upon the present record, the right of the people to sue for and recover the money or damages in controversy is not challenged by the county of New York; and the question does not arise in consequence of any claim made by the county, or on its behalf, to the money or damages sought to be recovered. It is raised only by the alleged wrong-doers, and as a means of defeating the action brought against them by the State. To be effective for that purpose it should appear, not only that the defendants are liable to the county, but to that civil division of the State exclusively, and that a recovery of the State itself and satisfaction thereof, would not bar a subsequent recovery on behalf of the county for the same acts.

The main points urged on the argument on the part of the demurrant, in support of his defence that the money which he took belonged to the county, are these:

First. That the bonds upon which the money was borrowed were county bonds; that when a county borrows money pursuant to law, upon its own bonds, the proceeds belong to the county on the same principle as that upon which money borrowed by a natural person or by a corporation authorized to borrow money, becomes the property of the borrower.

Second. That the money so borrowed was actually paid into the county treasury, and that its abstraction, by means of the certificates alleged to be fraudulent, was from that treasury; and,

Third. That such deposit of the borrowed money in the county treasury is alleged in the complaint to have been

made in formal compliance with the statutes and usual modes of official proceedings in the city of New York.

The allegation that the deposit of the money in the county treasury was in compliance with the statutes, is matter of law and not of fact. It does not, therefore, conclude either party on demurrer. As matter of law, no statute can be found authorizing the deposit of these funds in the county treasury. The only acts bearing upon the question to which we have been referred are Laws of 1862, chapter 37, section 2, and 1 Revised Statutes, page 369, section 20, and page 370, section 29. The act of 1862 provides for the payment into the treasury of the county of moneys loaned upon revenue bonds of the county, issued in anticipation of the collection of the annual taxes of the county, to pay the ordinary charges and expenses under appropriations made by the board of supervisors for the support of the county government, and is expressly restricted to taxes authorized to be raised during the same year in which the money is borrowed. This act is clearly inapplicable to the fund now in question. The act of 1865 merely provides that all revenue of the city and county shall be deposited in the banks designated by the chamberlain. The proceeds of the bonds now in question cannot be called revenue of the city or county. The mode provided by other statutes, which have been referred to, for drawing moneys out of the treasury of the county, do not affect the question, what moneys should properly go into such treasury. The only statutory provisions relevant to the question are 1 Revised Statutes, 369, sections 20 and 29, which provide that it shall be the duty of the county treasurer to receive all moneys belonging to the county, from whatever sources they may be derived, and that the chamberlain of the city and county of New York shall be the county treasurer thereof. And this brings us back to the original question, whether the fund raised by the issue of these bonds belonged to the county. If not, the mere deposit of them in bank to the credit of the chamberlain did not invest the supervisors with the exclusive right to such moneys. " The

county treasury cannot become the depository of any funds but those that the law brings to it." (*Jefferson County* v. *Ford*, 4 Greene [Iowa], 370.)

The only fact upon which the defendants can rely in support of their claim that these moneys belonged to the county is, that the bonds upon which they were raised were county bonds. If a general power to borrow money for its own purposes had been given to the county, or if the money in question had been raised pursuant to law, in anticipation of the annual taxes of the county, to pay its ordinary charges and expenses under appropriations made by the board of supervisors for the support of the county government, which is the class of moneys to which the act of 1862 relates, a title in the county might be made out. In that case, the control and power of disposition of the money would be conferred by law upon the supervisors. They could appropriate and apply it to the expenses of the county government according to their discretion. But the present case is entirely different. The money was raised for a specific purpose designated in the act, and the supervisors and all the county officers combined had no authority or power to divert a single cent of it from the specified purpose. There was no grant of the money in any form to the county. There was no surplus to arise in which the county could be interested, for no more was to be raised than precisely sufficient to pay the particular claims which should be certified by the auditors. There was no direction to pay the money into the county treasury, nor was the least power or control over it given to the supervisors, not even its custody. On the contrary, the State undertook, through its own direct agents, named in the act, to administer the fund to the exclusion of any act of the supervisors. The claims were to be audited by the special board appointed by the legislature, and to be paid by the comptroller of the city. There could not, legally, be any interference in the matter by the board of supervisors.

But it is said the credit of the county was pledged to the bondholders, and, therefore, the county should have the

money.  What is the credit of the county?  It is not like the credit of an individual or a corporation having power to contract debts, and property out of which they can be collected by legal process.  The county is one of the civil and political divisions of the State.  It holds property only for public uses, and no such property is liable on civil process for debts.  The State, in this case, provided for the payment of certain debts of the county by directing the local authorities to levy taxes within the boundaries of their county, and in anticipation of the collection of such taxes authorized the issue of bonds. The creditors who took the bonds trusted the justice of the State and not the county, which was powerless to pay them, except through the means provided by the State.  The obligations in question were not obligations voluntarily incurred by the county, or in consequence of any negotiation made by it, but were created by order of the State, for the purpose of carrying into effect a statute of the State, and the faith of the State is pledged not to withdraw its requirement that the local authorities shall levy the tax for the purpose of reimbursing to the bondholders the money advanced by them upon the bonds.  The bonds amount to nothing more than legally authorized certificates of the amount which each holder is entitled to receive out of the tax which the State has directed to be levied, and on the faith of which tax the lender has advanced his money.  The State, then, is the party by whose power and authority the money was raised and must be repaid.

The county organization is the mere agency to carry out the will of the legislature, and is compelled to do so.  Can it be questioned that the State has an interest in protecting the fund, and recovering it, or its equivalent in damages, from those who have wrongfully possessed themselves of it by combining with the agent of the State?  What right did the supervisors of the county ever have to the possession of this fund?  It is impossible to point to any law giving them such a right.  What power of disposition would they have over it should they now recover and collect it?  What could they do

with it ? If it were their money they could do anything they chose with it — apply it to the payment of the expenses of the board of supervisors, or to the erection of public buildings, or to any other purposes, or to release it. But it is evident that any such use of the fund would be clearly in contravention of law. The authority to raise it was for the sole purpose of paying claims existing prior to April 26, 1870, and it could not lawfully be applied to any other. Those claims have been paid and overpaid. It is said the supervisors might apply it toward the payment of the revenue bonds upon which it was raised, or of those which have been substituted in their place. To the assertion that if the supervisors got the funds they might have exerted the physical power of applying them to the payment of those bonds, it is a sufficient answer, in law, that they had no legal right so to do, and, in fact, that they might have made some different disposition of them. To hold that where a fund raised as this was, under an act of the legislature, for a specific purpose named in the act, has not been applied to the purpose for which it was raised, the supervisors of a county have the legal right or power to apply it to a different use, is too monstrous a proposition to be seriously entertained. It would be to allow the agent to overrule the principal.

It cannot be supposed that the legislature ever intended that any such result should follow as that $6,000,000 should be raised on the credit of the taxing power of the State and placed at the disposal of the supervisors of the county of New York, without any direction as to its application, especially in view of the fact that the legislature has consistently denied to that county the unlimited power which is accorded to others, of raising by tax the amount deemed necessary for the expenses of local government, and has compelled the county of New York to come every year to the legislature with a specification of the amount desired to be raised, and of the purposes in detail to which the money so to be raised is to be applied. Not only has the general taxing power conferred upon boards of supervisors of other counties of the

State been withheld from the county of New York, but for a long period the existence of the county as an organization was nominal merely. A record of the proceedings of the board of supervisors of that county covering a period of thirty years, prior to the year 1840, is contained in a single small volume, and they show that it existed as a county more for the purpose of designation than for any substantial governmental purpose. The territory was the same as that of the city, and the latter exercised all the powers of municipal government. In 1857, and subsequently, additional powers were from time to time conferred, and were often used for corrupt purposes, but the act of 1870 stripped the board of the most important of these powers and conferred them upon the special auditors. The proposition that the supervisors, thus denuded of power, are the proper body to call to account the State agents who have superseded them, is a solecism unsupported by law or logic. The people of the State, through their legislature, are the only power who can prescribe the ultimate disposition of this fund. (*State of Maryland* v. *B. and O. R. R.*, 12 Gill & J., 399; S. C., 3 How. [U. S.], 534.)

I can see no ground upon which the supervisors of the county can claim the fund or damages in question to the exclusion of the State. The only purpose for which any party can claim to recover and hold this money is for the indemnity of the tax-payers, who are or will be burdened with the bonds. But there is no law creating the supervisors trustees for any such purpose. Supervisors are not the representatives or guardians of the tax-payers. They are local officers whose duties are definitely prescribed by statute, and they cannot exceed the powers thus conferred upon them. The actions which they may bring are confined to such as are specified in the statutes and necessary to enforce liabilities or duties enjoined by law to them or to the body which they represent, that is, the county in its corporate character. They have no right to intervene for the protection of the general interests of the inhabitants or tax-payers of the county. (2 Denio, 464; 17 N. H., 214; 6 Allen, 356; 4 Black [Ind.], 256.) This duty

specially devolves upon the State authority. (*Davis* v. *The Mayor*, 2 Duer, 663; S. C., 14 N. Y., 526; *Attorney-General* v. *Eastlake*, 11 Hare, 223.) The legal custodian of the fund which may be recovered in this action is not pointed out by any statute, and this is very natural. The existence even of such a fund was unanticipated, as it was not intended that any more money should be raised on bonds than should be paid out on regularly audited claims. But I think it a safe and a necessary doctrine, that where moneys are thus raised, under color of law, upon obligations which are a burden upon the tax-payers of the State at large, or of a particular locality, and such moneys are unlawfully appropriated by individuals, and there is no local authority or officer clearly vested by law with the right to sue for their recovery, the State must of necessity be held to be the proper party to prosecute. Were it otherwise, public funds thus situated would be wholly unprotected and liable to be plundered with impunity.

But assuming that there was a right of action in the supervisors, as contended by the defendant, such right of action must have been founded upon some title to the fund conferred by the State. If the title to the fund was thus conferred upon them, it could only be held for public uses theretofore declared, or thereafter to be declared, by the legislature. It is impossible to conceive of any other kind of property they could have had in the fund. Certainly, no individual right or interest in it. Supposing, then, that on some such ground the supervisors had a right of action, but that they refused or neglected to prosecute, was there then no redress? Could those who had taken the money retain it and be free from all responsibility for their acts? And must the tax-payer quietly submit to be taxed for the benefit of the wrong-doers? No one has as yet ventured to assert so bold a proposition. On the contrary, it seems to be conceded that in such a case the State might sue, but it has been suggested that, to entitle the people thus to intervene, they should have alleged in their complaint the refusal or neglect of the county officers to prosecute, and

that with such an allegation the action might be maintained in behalf of the people.   This necessarily concedes some interest on the part of the people in enforcing the claim against the defendants, for if they have none, the failure of particular persons or officers to prosecute could confer no right upon them.   If, then, the people have an interest in the controversy, on what principle can it be claimed that they must defer to their subordinates and await their pleasure ?

The case of stockholders in private corporations is claimed to be analogous.   In such cases it has been frequently adjudicated, that for the recovery of property belonging to the corporation, or of damages sustained by wrongs done to it by its officers or others, the stockholders, although being those ultimately injured by the wrongs complained of, will not be heard in court, unless the persons who are appointed by law to represent their interests refuse to perform their duty, or are so far implicated in the wrongs to be redressed that it would not be safe to intrust the prosecution to their hands. Under those circumstances, courts of equity will entertain a proceeding by the stockholders in their own names.   But the ground upon which stockholders are allowed to prosecute in the case supposed is totally different from that upon which the State claims to intervene in the present case.   Stockholders have no interest to represent or protect, except their own pecuniary interest in the property of the corporation, and it is necessary, before they can be heard, to show that their rights are not duly cared for by those whom the law has appointed to protect them.   But the interest of the State in the questions now at issue is of a totally different description.   It is not for the protection of a proprietary or pecuniary interest of its own in the subject-matter that it claims the right to intervene, but for the protection of a portion of its citizens against the wrongful act of its own appointees and their confederates, who have, under color of authority conferred by the State, raised and appropriated to their own use a large sum of money, which must be repaid by the tax-payers of the division of the State where the money was raised.   There is

no similarity between the position of the State in such a controversy and that of a stockholder in a private corporation. To the State primarily belongs the power, and upon it devolves the duty, of redressing just such wrongs; and unless it has in this instance delegated to some of its departments not only the right, but the exclusive right, to perform this duty, it has not stripped itself of its own powers, or rendered an application to its delegates and a refusal on their part to act a necessary preliminary to its own invocation of the action of the judiciary.

It is claimed on the part of the defendants, and this is the plea upon which they have expended the most of their force, that it would be placing too much power in the hands of the attorney-general to allow him, without an express statute, to institute proceedings against public officers charging them with abuses of public trust. This is a very feeble argument; as well might it be urged that a general power of attorney from one individual to another to prosecute and defend all actions in which the principal actually, or in the judgment of the attorney, had an interest was impolitic and void, as giving to the attorney too much power; yet this is the power of attorney which the State has given to its attorney-general and requires him to execute. It must be borne in mind that the only power of the attorney is to bring the matters in dispute before the courts in proper form for their adjudication. The attorney has no power to decide them, whether he be an attorney for an individual or for the State. His province is simply to lay the question in dispute before the court. True policy would seem to dictate liberality in thus permitting controversies to be ventilated. The responsibility of deciding them does not rest with either party, but with the tribunals of justice before whom the cause is heard. The safety of the public is, in my humble judgment, better subserved by throwing open than by closing approaches to these tribunals for the remedy of public wrongs of the description disclosed in this action.

The only substantial ground upon which the defendant

in such a case might, with propriety, decline to answer at the suit of the attorney-general, would be that a recovery by him and satisfaction thereof would not be a bar to a subsequent action for the same cause by the local authority. If this could be made out it would be a perfect answer to the action; but it cannot. When the suit is brought by the attorney-general, in a matter within his authority, no other involving the same questions can be instituted. And when a judgment is pronounced in such a suit, as the attorney-general represents the public, all persons are bound by the decision. A judgment for or against the defendants in the present action would, consequently, be a perfect protection to them against any subsequent or other action against them for the same acts.

I have not referred in detail to the authorities upon which I have relied in confirmation of these views. They have been elaborately cited and discussed in the briefs and in the arguments of the eminent counsel on both sides who have argued before the court, and references to them will be made by the reporter. It is sufficient to say that I have carefully examined them and discussed them with my fellow judges, and that but for the prolixity which would be occasioned by an extended review of them, and a demonstration of their applicability to the present case, I would cheerfully devote myself to that labor. I think it more useful to state the results. In my opinion the judgment should be reversed, and judgment should be rendered for the plaintiffs on the demurrer, and leave to answer should be granted.

All concur for affirmance, except CHURCH, Ch. J., and RAPALLO, J., dissenting.

Judgment affirmed.