(May 8, 2012)

■ THE PEOPLE OF THE STATE OF NEW YORK, by Andrew M. Cuomo, Respondent, v MAURICE R. GREENBERG et al., Appellants. [946 NYS2d 1]—

Order, Supreme Court, New York County (Charles E. Ramos, J.), entered October 21, 2010, which, to the extent appealed from, denied defendants Maurice R. Greenberg's and Howard I. Smith's motions for summary judgment dismissing the Martin Act (General Business Law § 352-c [1] [a], [c]) and Executive Law § 63 (12) claims as against them, and granted the Attorney General's motion for summary judgment on the issue of liability with respect to one of two challenged transactions, modified, on the law, to deny the Attorney General's motion, and otherwise affirmed, without costs.

Introduction

The Attorney General brought this action against American International Group (AIG), its former CEO (Maurice R. Greenberg) and its former CFO (Howard I. Smith) alleging that defendants violated Executive Law § 63 (12) and the Martin Act based upon their role in fraudulent transactions designed to portray an unduly positive picture of AIG's loss reserves and underwriting performance. AIG, formerly the largest insurance company in the world, entered into a settlement agreement with the Attorney General with respect to these and other claims, paying over $1 billion in damages and penalties. The details of the challenged transactions are as follows.

The GenRe Transaction

In the third quarter of 2000, AIG reported that its loss reserves (funds set aside to pay future claims on policies) had declined by $59 million from the previous quarter, while its net premiums increased by 8.1%. In the industry, this could be viewed as an indication of a company's deteriorating financial condition. In an effort to shore up its loss reserves, Greenberg called Ronald Ferguson, the CEO of General Reinsurance Corporation (GenRe), to discuss the possibility of AIG's entering into a loss portfolio transfer (LPT) involving "finite reinsurance" with GenRe. Greenberg testified at his deposition that he made the call in October 2000, based upon his concerns about AIG's loss reserves. He testified that he remembered inquiring about borrowing some of GenRe's reserves through an LPT. He did not remember the details of the conversation but testified that he told Ferguson that AIG would pay GenRe if it was willing to accommodate the request.

After the conversation, Ferguson designated Richard Napier, a senior GenRe executive, to handle the details from GenRe's

end. Greenberg appointed Chris Milton, a senior vice president at AIG and the head of reinsurance, to work out the details for AIG.

Greenberg testified that he had a second telephone conversation with Ferguson in November 2000 and that Ferguson told him that GenRe could provide AIG the product it had requested. Greenberg also testified that he had contemporaneous discussions with Milton and Smith concerning the GenRe transaction, but denied any knowledge of its fraudulent nature. Smith testified at his deposition that Milton advised him of the general terms of the GenRe deal. The actuaries testified that Smith was responsible for recording the transaction. Moreover, Smith participated in the meeting regarding commuting the GenRe transaction from an LPT to profits. Although AIG's underwriting practices required internal actuarial review of any proposed insurance agreement over $20 million, no underwriting analysis of the GenRe transaction was directed or performed.

The draft contract between AIG and GenRe provided, in general terms, that GenRe would pay AIG $10 million to assume a specified amount of risk, namely $100 million for six to nine months. The premium was $500 million on a 98% funds withheld basis, meaning that GenRe could charge AIG only for losses beyond the $500 million premium (up to a $600 million cap on losses).

The Attorney General alleges that the $100 million loss exposure was illusory, that at least half of the contracts covered by the GenRe transaction had already been reinsured by other carriers and thereby carried no risk to AIG, and that AIG and GenRe had separately agreed that, for accommodating AIG in its request to structure the transaction as no risk, GenRe was paid a $5 million fee, and the $10 million premium payment was secretly returned to GenRe through other, unrelated agreements. In his deposition in this litigation, Napier testified that the parties "involved" in the separate side deal included Greenberg, Ferguson, and Milton. Greenberg denied knowledge of both the no-risk nature of the GenRe transaction and the side deal concerning the fee and the return of the premium.

According to generally accepted accounting principles, an LPT can only be recorded as loss reserves if the risk insured exceeds a 10% chance of a 10% loss. If, as the parties presently concede, there was no risk of loss in the GenRe transaction, it should have been recorded on AIG's financials as a deposit. Instead, AIG recorded $250 million in loss reserves for the fourth quarter of 2000 based upon the GenRe transaction and an additional $250 million in loss reserves for the first quarter

of 2001, consistent with Greenberg's intent when he reached out to Ferguson, to shore up the reserves. Had these amounts not been credited in this manner, AIG would have had a $187 million decline in its loss reserves by the first-quarter of 2001. In a press release regarding AIG's 2001 first-quarter financial picture, Greenberg is quoted as being pleased with a number of favorable financial indicators, including the reversal of the loss reserve declines.

In 2001, 2002, and 2003, Greenberg and Smith certified AIG's 10-K financial disclosure reports with the SEC, each year recording the $500 million from GenRe as loss reserves. In 2003 and 2004, Greenberg participated in decisions regarding characterizing the GenRe transaction, and, in late 2004, $250 million was commuted to profits.

In early 2005, AIG received subpoenas from the Attorney General and the SEC for information regarding the GenRe transaction. AIG retained outside counsel to perform an internal investigation, and PricewaterhouseCoopers (PwC), the auditor, initiated an expanded audit to review AIG's prior financials and certain transactions. Barry Winograd, the PwC partner in charge of the audit, testified at his deposition that he had frequent contact with Greenberg throughout the investigation and that Greenberg was particularly interested in PwC's findings with respect to GenRe.

In March 2005, AIG issued a press release admitting that the GenRe transaction documentation was improper, stating that in light of the lack of evidence of risk transfer, the transactions should have been recorded as deposits. Defendants subsequently resigned their positions as CEO and CFO of the company. On May 31, 2005, following defendants' departures from AIG, the company's new management filed AIG's 10-K for 2004, restating the financials submitted from 2000 to 2004. In the restatement, AIG explained that "[GenRe] was done to accommodate a desired accounting result and did not entail sufficient qualifying risk transfer. As a result, AIG has determined that the transaction (s) should not have been recorded as insurance."

In June 2005, two GenRe executives pleaded guilty to participating in a conspiracy to commit securities fraud for their role in the GenRe transaction. In February 2008, four other GenRe executives were convicted on federal criminal charges with respect to the GenRe transaction. Those convictions were reversed upon evidentiary errors and the case was remanded for a new trial (*see United States v Ferguson*, 553 F Supp 2d 145 [D Conn 2008]).

The Capco Transaction

Beginning in the early 1990s, various AIG subsidiaries were writing auto warranty insurance policies. In late 1999, an actuarial consultant retained by AIG concluded that the company was facing an underwriting loss ratio of 265% in this area. At his deposition, Greenberg admitted that AIG's auto warranty business up until the late 1990s "was not handled properly," that he was annoyed about the situation, and that he may have referred to the situation as a "debacle." Greenberg also admitted giving specific instructions to Charles Schader, about reforming the auto warranty business, and testified that he had regular calls with Schader, and other employees, about his concerns, including on weekends. These calls concerned "everything from . . . consultation of outstanding contracts and policies, claims handling, and mitigation of loss."

Greenberg also testified that he directed an internal audit of AIG's auto insurance business to review the auto warranty business and to explore ways to mitigate projected losses. The parties do not dispute the details of the transaction structured to meet these objectives between AIG and Capco Reinsurance Company, Ltd. (CAPCO), an offshore shell company controlled by AIG. AIG, which did not treat CAPCO as a consolidated entity on its financial statements, sold shares in the shell company over time so as to trigger recognition of $162.7 million in capital losses (which the investing public would not deem as significant to the company's financial well-being). The amount corresponded to AIG's payment of over $183 million in underwriting losses.

Both Greenberg and Smith defended their approval of the CAPCO transaction, testifying that Joseph Umansky, the Senior Vice President of AIG, had assured them that it would be structured to properly comply with all legal, accounting, and regulatory guidelines. By contrast, the Attorney General claims that Smith directed Umansky to develop a transaction to convert underwriting losses into capital losses, that both defendants received an April 2000 memo from Umansky proposing the CAPCO deal, and that Greenberg personally directed Umansky to contact the president of an AIG private bank in Switzerland to locate outside investors to buy the CAPCO common stock. After Greenberg and Smith left the company in 2005, AIG announced that CAPCO involved an improper structure created to characterize underwriting losses relating to the auto warranty business as capital losses.

Procedural History

In September 2009, the Attorney General, Greenberg and Smith all filed motions for summary judgment. The motion

court denied Greenberg's and Smith's motions in their entirety. It granted the Attorney General's motion in part, finding that Greenberg and Smith's knowledge and participation in the CAPCO transaction constituted a violation of the Martin Act and Executive Law § 63 (12) as a matter of law. Greenberg and Smith each appeal from the denial of their motions and the partial grant of the Attorney General's motion. The Attorney General appeals from the portion of its motion that was denied.

Appellate Contentions

The issues before us include (1) whether the action is preempted by federal law; (2) whether the court properly denied defendants' motions for summary judgment regarding the GenRe transaction; and (3) whether the court properly granted the Attorney General summary judgment on liability regarding the CAPCO transaction.

Preemption

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding" (US Const, art VI, cl 2). This broad language gives Congress the power to supersede state statutory, regulatory and common law (*People v First Am. Corp.*, 18 NY3d 173, 179 [2011]; *Guice v Charles Schwab & Co.*, 89 NY2d 31, 39 [1996], *cert denied* 520 US 1118 [1997]). Preemption can arise by: (i) Congress's express preemption; (ii) Congress establishing a comprehensive regulatory scheme in an area effectively removing the field from the state's realm; or (iii) an irreconcilable conflict between federal and state law (*Matter of People v Applied Card Sys., Inc.*, 11 NY3d 105, 113 [2008], *cert denied* 555 US 1136 [2009], citing *Balbuena v IDR Realty LLC*, 6 NY3d 338, 356 [2006]). The United States Supreme Court has instructed that, in determining whether federal law preempts state law, a court's "sole task is to ascertain the intent of Congress" (*California Fed. Sav. & Loan Assn. v Guerra*, 479 US 272, 280 [1987]; *see also Medtronic, Inc. v Lohr*, 518 US 470, 485 [1996] ["(T)he purpose of Congress is the ultimate touchstone in every pre-emption case" (internal quotation marks omitted)]; *Matter of People v Applied Card Sys., Inc.*, 11 NY3d at 113).

Defendants argue that this action is precluded by the express language of title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA) (15 USC § 78bb [f] [1], [2]). They also claim that the claims asserted by the Attorney General conflict with Congress's intent to create a uniform federal stan-

dard for securities litigation as evidenced by governing securities litigation, namely, the Private Securities Litigation Reform Act of 1995 (PSLRA) (15 USC § 77z-1), the National Securities Markets Improvement Act of 1996 (NSMIA) (15 USC § 77r) and SLUSA, and the cases which construe these statutes. However, nothing in the language or legislative history of the cited legislation indicates Congress intended to preempt this civil enforcement action under the Martin Act and the Executive Law (*People v Applied Card Sys., Inc.*, 11 NY3d at 115). In fact, the cited statutes, their legislative histories and the case law presuppose an important role for state Attorneys General in investigating fraud and bringing civil actions to enjoin wrongful conduct, vindicate the rights of those injured thereby, deter future fraud, and maintain the public trust.

The NSMIA, codified at 15 USC § 77r (a) (2) (B), expressly preempts any state law that "directly or indirectly prohibit[s], limit[s], or impose[s] any conditions upon the use of . . . any proxy statement, report to shareholders, or other disclosure document relating to a covered security" registered under 15 USC § 78o-3.

As the motion court stated, the purpose of NSMIA is to preempt any state Blue Sky Laws that would require the issuers of securities to comply with certain state registration requirements prior to marketing in the state, in recognition of the redundancy and inefficiency of such requirements (*see Zuri-Invest AG v Natwest Fin. Inc.*, 177 F Supp2d 189, 192 [2001]). Accordingly, NSMIA precludes states from imposing their own requirements for disclosure on prospectuses, traditional offering documents, and sales literature relating to covered securities (*id.*).

However, a savings clause in the NSMIA permits states to retain jurisdiction to police fraudulent conduct: "Consistent with this section, the securities commission (or any agency or office performing like functions) of any State *shall retain jurisdiction* under the laws of such State to *investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions*" (15 USC § 77r [c] [1] [emphasis added]). The legislative history of NSMIA confirms Congress's intent "not to alter, limit, expand, or otherwise affect in any way any State statutory or common law with respect to fraud or deceit . . . in connection with securities or securities transactions" (Rep of House Comm on Commerce, HR Rep 104-622, 104th Cong, 2d Sess, at 34, reprinted in 1996 US Code Cong & Admin News, at 3877, 3897).

The PSLRA was enacted in 1995 to set uniform federal standards for private plaintiffs seeking to bring actions against issuers of publicly traded securities. Because the PSLRA set heightened pleading standards for cases brought in federal court, the statute had the unintended effect of what Congress termed a "migration" of frivolous class action securities litigations to state court, undermining PSLRA's aim.[1] Accordingly, in 1998, Congress passed SLUSA, which provides, as relevant, that "[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" (15 USC § 78bb [f] [1] [A]).

Defendants argue that SLUSA preempts this action because the state Attorney General is seeking, in a de facto representative capacity, to litigate claims on behalf of a "covered class" of AIG investors seeking to recover for their financial losses, in frustration of the legislation's intent to create uniform federal standards for such litigation. However, this is not a shareholder derivative lawsuit, and in fact, there is such an action presently pending in federal court against defendants.[2] Rather, after years of joint federal and state investigation, the Attorney General exercised the discretion of his office to bring this enforcement action pursuant to the Executive Law and the Martin Act, to protect the citizens of this State and the integrity of the securities marketplace in New York, to enjoin allegedly fraudulent practices, and to direct restitution and damages to deter future similar misconduct (*see People v Applied Card Sys., Inc.*, 11 NY3d at 109; *People v Bunge Corp.*, 25 NY2d 91, 100 [1969]; *compare Merrill Lynch, Pierce, Fenner & Smith Inc. v Dabit*, 547 US 71 [2006] [class action securities litigation]; *Kircher v Putnam Funds Trust*, 547 US 633 [2006] [same]).

Thus, nothing in the federal legislative scheme indicates that Congress intended to preempt this action, and in fact, the cited statutes express the importance of the state's role in policing fraud (*see Bunge* at 100). Nor is there any indication that Congress intended to preclude the Attorney General from seeking monetary recovery in order to deter alleged fraudulent

---

**1.** Summary of Testimony of United State Securities and Exchange Commission, available at http://www.sec.gov/news/testimony/testarchive/1997/tsty1997.txt.

**2.** The Attorney General has apprised the federal court of the status of this litigation. Defendants have represented to this Court that a hearing date has been set (June 28, 2012) for approval of class action claims against them.

conduct (*see People v Coventry First LLC*, 13 NY3d 108, 114 [2009] [Attorney General has statutory authority to seek both injunctive and victim specific relief, comparable to the EEOC in the federal arena]; *People v Applied Card Sys., Inc.*, 11 NY3d at 109).

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)* (770 F2d 328 [1985]) and *Merrill Lynch, Pierce, Fenner & Smith, Inc. v Cavicchia* (311 F Supp 149 [1970]) are two of a number of cases cited by defendants which are distinguishable on their facts. In *Baldwin*, 31 states were challenging an injunction precluding them from commencing state law actions for money damages to supplement sums received by the same plaintiffs who had entered into settlement agreements in a number of consolidated class action securities litigations. Here, unlike *Baldwin*, no settlement has been approved in the class action pending in federal court. Further, as stated above, this enforcement action has aims and seeks remedies broader than the restitution sought in *Baldwin*.

*Cavicchia* involved a statutory interpleader action brought by securities brokers from New York and New Jersey. The plaintiffs sought the transfer of sequestered funds held by the New York State Attorney General to an impartial receiver, so that the monies could be distributed to defrauded individuals from both states (311 F Supp at 158). The court granted plaintiffs the requested relief, finding no conflict between its order and the sovereign rights of New York's Attorney General under the Eleventh Amendment to the United States Constitution (*id.*). Here, in contrast to *Cavicchia*, the Attorney General's enforcement action is in pretrial motion practice. No trial has been had on either liability or damages, and there are no issues before us regarding competing states' rights.

Accordingly, upon review of the cited federal legislation (NSMIA, PSLRA, SLUSA), the relevant legislative history, and the governing case law, we find no evidence that Congress intended to preempt the Attorney General's Martin Act and Executive Law claims in this action.

State Claims

The Martin Act defines fraud as "any device, scheme or artifice . . . deception, misrepresentation, concealment, suppression, fraud, false pretense or false promise" (General Business Law § 352 [1]). Fraud under the Martin Act includes all deceitful practices contrary to the plain rules of common honesty and all acts tending to deceive or mislead the public (*see People v Sala*, 258 AD2d 182, 193 [1999], *affd* 95 NY2d 254 [2000]). Executive Law § 63 (12) includes "virtually identical language" to

the Martin Act (*State of New York v Rachmani Corp.*, 71 NY2d 718, 721 n 1 [1988]). Both statutes have been liberally construed to "defeat all unsubstantial and visionary schemes . . . whereby the public is fraudulently exploited" (*People v Federated Radio Corp.*, 244 NY 33, 38 [1926]). The Attorney General need not prove scienter or intent to defraud in a civil claim under either statute (*Rachmani*, 71 NY2d at 725 n 6; *see People v Lexington Sixty-First Assoc.*, 38 NY2d 588, 595 [1976] ["the terms 'fraud' and 'fraudulent practices' [are] to be given a wide meaning so as to embrace all deceitful practices contrary to the plain rules of common honesty, including all acts, even though not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead"]; *see also People v American Motor Club*, 179 AD2d 277, 283 [1992], *appeal dismissed* 80 NY2d 893 [1992]). However, an essential element of the Attorney General's Martin Act claims is that the alleged fraudulent transactions be material, i.e., that they have more than a trivial effect on net income or shareholder equity (*see TSC Industries, Inc. v Northway, Inc.*, 426 US 438, 449 [1976]).

Officers and directors are liable for a corporation's fraud where they either personally participate in the fraud or have actual notice of its existence (*Marine Midland Bank v Russo Produce Co.*, 50 NY2d 31, 44 [1980] ["(a) principal that accepts the benefits of its agent's misdeeds is estopped to deny knowledge of the facts of which the agent was aware"]; *accord People v Apple Health & Sports Clubs*, 80 NY2d 803, 807 [1992]).

Summary Judgment

"Summary judgment permits a party to show, by [admissible evidence], that there is no material issue of fact to be tried, and that judgment may be directed as a matter of law" (*Brill v City of New York*, 2 NY3d 648, 651 [2004]). It is a "drastic remedy"—depriving the parties of a trial, and as such, should only be granted where there is no doubt as to the existence of a triable issue of fact (*see Glick & Dolleck v Tri-Pac Export Corp.*, 22 NY2d 439, 441 [1968]). The function of a court in reviewing such a motion is issue finding, not issue determination, and if any genuine issue of material fact is found to exist, summary judgment must be denied (*Phillips v Kantor & Co.*, 31 NY2d 307, 311 [1972]). Further, where credibility determinations are required, summary judgment must be denied (*see Glick & Dolleck*, 22 NY2d at 441).

CPLR 3212 (b), which governs the type of proof admissible in support of a motion for summary judgment, allows for consideration of affidavits, the pleadings and other available proof, such as depositions and written admissions (*Andre v Pomeroy*, 35

NY2d 361 [1974]).[3] This Court has specifically held that witness statements from a Martin Act interview conducted by the Attorney General before an action was brought are admissible in support of a motion for summary judgment (see *State of New York v Metz*, 241 AD2d 192, 198-199 [1998]). Moreover, restatements of earnings have been held admissible under the Federal Rules of Civil Procedure as a business record (see *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 375313, *7, 2005 US Dist LEXIS 2215, *23 [SD NY 2005] ["company's admission of what its financial statements should have been in prior years is highly probative of whether the previously filed documents were false"]).

All of the evidence submitted on a motion for summary judgment is construed in the light most favorable to the opponent of the motion (*Branham v Loews Orpheum Cinemas, Inc.*, 8 NY3d 931 [2007]). Further, in opposition to such motion for summary judgment, a court can consider hearsay evidence (see *DiGiantomasso v City of New York*, 55 AD3d 502 [2008]; *Matter of New York City Asbestos Litig.*, 7 AD3d 285, 285 [2004] ["evidence otherwise excludable at trial may be considered in opposition to a motion for summary judgment as long as it does not become the sole basis for the court's determination"]).

Applying these principles, we find that the record evidence, including the witness-deponents' hearsay testimony submitted by the Attorney General regarding the defendants' actions and statements, presents triable issues of fact as to whether defendants knew of, or participated in the fraudulent aspects of the GenRe and CAPCO schemes, given the nature and degree of their personal involvement in both of the challenged transactions, as well as defendants' responsibilities within the corporation (see *Polonetsky v Better Homes Depot*, 97 NY2d 46, 54 [2001]).

With respect to GenRe, Greenberg admits to two relevant phone calls with Ronald Ferguson: the first, initiated by Greenberg, to specifically inquire about an LPT; the second, initiated by Ferguson, to let Greenberg know that the transaction

---

**3.** It bears noting that evidence given at a related criminal trial resulting in a conviction may properly be considered on a motion for summary judgment (*Edmonds v New York City Hous. Auth.*, 224 AD2d 191 [1996]). Here, at the time the motion court issued its decision, a judgment had been rendered in federal district court in Connecticut, convicting a number of individuals from GenRe, and one from AIG, of various felonies. Thus, there was no error in the motion court's consideration of the criminal trial testimony in its ruling. However, as the convictions have been reversed and the criminal matter remanded for a new trial, we confine our review to facts submitted independent of the Connecticut criminal litigation.

Greenberg had requested could be consummated. Winograd's deposition testimony regarding the degree of Greenberg's interest in the audit of GenRe and his knowledge as to the details of the transaction support the Attorney General's position that Greenberg was complicit in the illicit scheme. Further, both Smith and Greenberg signed the financial statements that falsely recorded the GenRe money as loss reserves. Greenberg admits that concern about AIG's loss reserves prompted his actions, but he and Smith vehemently deny any knowledge that GenRe was structured not to involve any risk, and both also deny participation in any fraudulent LPT.

With respect to CAPCO, Umansky's Martin Act interview implicates both Greenberg and Smith in the fraudulent characterization of the auto warranty losses as capital losses. Moreover, AIG's restatement of earnings is admissible as a business record (*see Worldcom*, 2005 WL 375313, *6, 2005 US Dist LEXIS 2215, *20) and, in conjunction with the excerpts of the depositions of Greenberg and Smith, supports the Attorney General's position that defendants actively participated in the CAPCO transaction with knowledge of the deceptive purpose it was intended to achieve.

However, given that defendants have submitted sworn denials of knowledge and participation in the CAPCO fraud, and have testified that they were assured by Umansky that the CAPCO deal was structured to comply with all of the applicable legal and regulatory requirements, summary resolution of their knowledge or participation in this alleged fraud cannot be determined as a matter of law.

In addition, the record presents triable issues of fact as to the materiality of the CAPCO transaction, given the competing evidentiary submissions concerning whether a reasonable investor would have found that the information about a quantitative and qualitative impact of the transaction significantly altered the total mix of information available (*see TSC Industries, Inc. v Northway, Inc.*, 426 US at 449, 450; *Rachmani*, 71 NY2d at 726). Concur—Gonzalez, P.J., Tom, Saxe and Richter, JJ.

Catterson, J., dissents in part and concurs in part in a memorandum as follows: I am compelled to dissent in part because I believe that the Martin Act and the Executive Law are preempted in this case by federal law. Even if this entire action was not preempted, the defendants Greenberg and Smith are nonetheless entitled to summary judgment dismissing the complaint against them concerning the Gen Re Transaction due to the utter failure of the New York Attorney General (hereinafter

referred to as NYAG) to oppose the defendants' motion with evidence in admissible form or to put forward an excuse for the failure to do so after five years of investigation and discovery. Barring preemption, I concur with the majority that the motion court's grant of summary judgment to the NYAG with regard to the CAPCO Transaction was error as the record contains disputed issues of material fact. We differ however, on the admissibility of certain evidence as well as the validity of the motion court's findings.

In 2006, the NYAG filed an amended complaint charging the defendants Greenberg and Smith, AIG's former CEO and CFO, with violating Executive Law § 63 (12) and General Business Law § 352-c (1) (a) and (c) (hereinafter referred to as the Martin Act). (*See generally People v Greenberg*, 50 AD3d 195 [1st Dept 2008], *lv dismissed* 10 NY3d 894 [2008].) The complaint alleged, among other things, that Greenberg and Smith personally initiated, negotiated and structured two sham reinsurance transactions to portray an unduly positive picture of AIG's loss reserves (hereinafter referred to as the Gen Re Transaction) and underwriting performance to the investing public (hereinafter referred to as the CAPCO Transaction).

The Gen Re Transaction

In the fall of 2000, facing investor concern over a large decrease in its "loss reserves" (funds to pay claims on policies), AIG contacted General Reinsurance Corporation (Gen Re) in order to borrow $200-500 million in reserves through a "loss portfolio" transfer (LPT) transaction. The record discloses that LPTs are a legitimate form of reinsurance. Gen Re was a subsidiary of Berkshire Hathaway. Ostensibly, AIG would reinsure Gen Re for $600 million in potential liability in exchange for $10 million in premiums ceded to AIG. AIG was to pay a $5 million fee to Gen Re. Greenberg spoke directly with Gen Re's CEO, Ronald Ferguson. Greenberg then tasked Christian Milton, AIG's head of reinsurance, to work on the idea of an LPT with Richard Napier, a senior vice president of Gen Re. The NYAG claims that AIG did not bear any risk in the transaction for which it paid Gen Re a $5 million fee; the NYAG thus asserts that the deal should have been booked as a deposit because of its no-risk structure, but that AIG booked the transaction as insurance, which increased AIG's loss reserves and made it appear to be financially healthier than it was.

On May 31, 2005, following the defendants' departures from AIG, new management filed AIG's Form 10-K for 2004, restat-

ing financial statements for 2000 through 2004 (hereinafter referred to as the Restatement).[4]

## The CAPCO Transaction

In 1999, AIG faced large underwriting losses based, in part, on its auto warranty policies. AIG developed a transaction to convert the underwriting losses into capital losses. Under the CAPCO Transaction, AIG "reinsured" the auto warranty underwriting losses through an offshore shell company, CAPCO Reinsurance, that was controlled by AIG. This allowed AIG, which did not treat CAPCO as a consolidated entity on its financial statements, to sell shares in the shell company over time so as to trigger recognition of $162.7 million in capital losses that corresponded to its payment of more than $183 million in auto warranty underwriting losses.

After Greenberg and Smith left AIG in 2005, AIG issued a press release and announced that the transaction involved an improper structure created to recharacterize underwriting losses relating to auto warranty business as capital losses.

## The Summary Judgment Motions

On September 22, 2009, Greenberg and Smith filed motions for summary judgment seeking to dismiss the claims asserted against them. The defendants argued that they were entitled to summary judgment because, inter alia, the claims were preempted by federal law, and any alleged misstatements or omissions in connection with the transactions were immaterial as a matter of law.

The NYAG filed a motion for partial summary judgment on liability with respect to the Gen Re and CAPCO Transactions. In brief, the NYAG argued that the Gen Re evidence showed that Greenberg: (1) initiated the Gen Re Transaction; (2) designated Christian Milton, the head of AIG reinsurance to work out details and report back to him; (3) agreed to the terms proposed by Gen Re, including an oral side agreement that AIG would not be subject to any risk; and (4) later boasted of the increase in loss reserves that were the result of the transaction. The NYAG argued that Smith was briefed on the terms of the no-risk deal and directed that it be booked as insurance.

With respect to CAPCO, the NYAG argued that the evidence

---

4. In June 2005, two Gen Re executives pleaded guilty to participating in a conspiracy to commit securities fraud for their role in effectuating the Gen Re Transaction. In February 2008, Milton and three Gen Re executives were convicted on Federal charges with respect to the Gen Re Transaction. Those convictions were subsequently reversed and the matter was remanded for a new trial. (*See United States v Ferguson*, 553 F Supp 2d 145 [D Conn 2008].)

showed that Greenberg directed AIG to stop writing new auto-warranty policies, that Smith directed AIG Senior Vice President Joseph Umansky to develop a transaction to convert the underwriting losses into capital losses, and both defendants received and approved of Umansky's proposal which was then implemented. Further, the NYAG alleged that Greenberg personally directed Umansky to contact the president of an AIG private bank in Switzerland to locate outside investors to buy the CAPCO common stock.

In opposition to the NYAG's summary judgment motion and in further support of their motions, the defendants first argued that the vast majority of the evidence cited by the NYAG in support of its claims was inadmissible hearsay. This included testimony and evidence from other proceedings, such as the Martin Act interview of Joseph Umansky conducted by the NYAG before the complaint was filed, and the testimony at the federal criminal prosecution in Hartford, Connecticut. The defendants also objected to the NYAG's reliance on certain handwritten notes and e-mails.

The defendants maintained that, based only on the admissible evidence, there was no support for the claims that they sought improper transactions or knew that they were improper. The defendants argued that based on the admissible record, the claims had to be dismissed because there was insufficient evidence to sustain a claim with respect to their participation in the transactions or knowledge that they involved no risk. At the very least, they argued that issues of fact precluded the grant of the NYAG's summary judgment motion.

With respect to the Gen Re Transaction, the defendants argued that the admissible evidence shows that while Greenberg contacted Gen Re to inquire about an LPT, it was solely AIG and Gen Re personnel, without the involvement of Greenberg or Smith, who worked on all the details of the transaction. This included the accounting decisions and anything else relating to the execution of transaction.

With respect to the CAPCO Transaction, the defendants argued that the admissible evidence, at minimum, raises disputed issues of fact as to their participation in or knowledge of the alleged improper nature of the transaction. The defendants cite the involvement of numerous legal and accounting professionals. The professional staff were charged with addressing all of the legal, regulatory and tax issues associated with the CAPCO Transaction. The defendants also relied upon such professionals to draft controlling documents and ensure that the transaction was proper and accounted for accurately.

The court denied the defendants' motions for summary judgment to dismiss the claims, and granted NYAG's motion for partial summary judgment on the issue of liability with respect to the CAPCO Transaction, but denied it with respect to the Gen Re Transaction.

Preemption

In my view, use of the Martin Act and the Executive Law in the context of alleged securities violations is, in this case, preempted by federal law. It is beyond dispute that the national market for securities requires the certainty of uniform standards. (*Guice v Charles Schwab & Co.*, 89 NY2d 31, 45-46 [1996], *cert denied* 520 US 1118 [1997].) In order to achieve this uniformity, Congress enacted a series of regulatory schemes that control the national securities markets.

In the Private Securities Litigation Reform Act of 1995 (hereinafter referred to as PSLRA) (15 USC § 77z-1, as added by Pub L 104-67, 109 US Stat 737), Congress specified the standards under which private litigants may bring suits against securities issuers. Less than three years later, recognizing that litigants were circumventing the PSLRA by invoking state-law causes of action, Congress enacted the Securities Litigation Uniform Standards Act of 1998 (hereinafter referred to as SLUSA) (15 USC §§ 77p, 78bb, as added by Pub L 105-353, 112 US Stat 3227), which explicitly precludes state law actions premised on allegations relating to securities transactions. Finally, through the National Securities Markets Improvement Act of 1996 (hereinafter referred to as NSMIA) (15 USC § 77r, as added by Pub L 104-290, 110 US Stat 3416), Congress preempted the vast majority of so-called blue sky laws, which had imposed a multiplicity of state law registration standards on securities issuers.

NSMIA rests on Congress's recognition that uniformity of regulations concerning nationally traded securities "promote[s] efficiency, competition, and capital formation in the capital markets," and "advance[s] the development of national securities markets . . . by, as a general rule, designating the Federal government as the exclusive regulator" of national securities markets. (Rep of House Comm on Commerce, HR Rep 104-622, 104th Cong, 2d Sess, at 16, reprinted in 1996 US Code Cong & Admin News, at 3877, 3878.) More recently the Supreme Court succinctly explained that "[t]he magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." (*Merrill Lynch, Pierce, Fenner & Smith Inc. v Dabit*, 547 US 71, 78 [2006].)

When PSLRA, SLUSA and NSMIA are read together it is pa-

tent that the Congress has determined that efficient securities markets require a uniform national standard governing liability for private class actions. (*See Lander v Hartford Life & Annuity Ins. Co.*, 251 F3d 101, 111 [2d Cir 2001].) Thus, any effort to circumvent that uniform federal scheme is barred by these federal statutes.

In this case, and as set out *infra*, the NYAG has instituted a lawsuit for the benefit of private parties. The NYAG has made clear in recent filings in parallel federal securities litigation regarding the exact same conduct (litigation that is unquestionably subject to the PSLRA), that the only relief that essentially is at issue here is an award of damages for a worldwide class of AIG shareholders.

It is hornbook law that "state and local laws that conflict with federal law are 'without effect.'" (*New York SMSA Ltd. Partnership v Town of Clarkstown*, 612 F3d 97, 103 [2d Cir 2010] [per curiam], quoting *Altria Group Inc. v Good*, 555 US 70, 76 [2008].) We have recognized two kinds of preemption relevant to the NYAG's claims: "express preemption, where Congress has expressly preempted local law," and "conflict preemption, where . . . local law is an obstacle to the achievement of federal objectives." (*New York SMSA Ltd. Partnership*, 612 F3d at 104, citing *Wachovia Bank, N.A. v Burke*, 414 F3d 305, 313 [2d Cir 2005]; *see also Guice*, 89 NY2d at 39.) Express and implied preemption each independently require dismissal of the NYAG's claims against Greenberg and Smith.

Federal law bars this action for two reasons. First, because this action is brought by the NYAG on behalf of private shareholders, it is indistinguishable from a private class action. Thus, it is precluded by SLUSA's express textual prohibition of class actions grounded in state law; in this case the Martin Act and the Executive Law. Second, taken together, the PSLRA, SLUSA and NSMIA impliedly preempt any litigation that seeks recovery of damages on a class basis for securities fraud under purely state law.

The U.S. Supreme Court has held that SLUSA prohibits suits, such as this one, which are advanced under state law alleging misrepresentations in connection with nationally traded securities "in which damages are sought on behalf of more than 50 people." (*Kircher v Putnam Funds Trust*, 547 US 633, 637 [2006].) *Kircher* directs that state courts dismiss actions falling within this preclusion of SLUSA and failure to do so is subject to review by the United States Supreme Court. (*See* 547 US at 646-648.)

There is no dispute that the NYAG seeks monetary damages

on behalf of a class of private shareholders. Indeed, the NYAG advised the federal court before whom the investors' consolidated securities class action is pending that the NYAG action seeks damages on "overlapping facts" for the same "class members." The NYAG here is not invoking the Martin Act and Executive Law to seek remedies limited to sovereign interests, but is seeking to bring an action impermissibly "in a de facto or de jure representative capacity on behalf of [the private shareholders]." (*See e.g. In re Baldwin-United Corp. [Single Premium Deferred Annuities Insurance Litigation]*, 770 F2d 328, 341 [2d Cir 1985].) Such "de facto or de jure" actions on behalf of private shareholders are barred by federal law and dismissal is required. (*See Kircher*, 547 US at 646-648.)

NSMIA further prohibits states from "directly or indirectly" imposing different disclosure requirements than federal law. (15 USC § 77r [a] [2] [B].) Federal law requires a showing of scienter and reliance for securities fraud claims—elements that the NYAG and the court below assert are not required in this case. Accordingly the NYAG's action also conflicts with and is barred by NSMIA. (*See Myers v Merrill Lynch & Co., Inc.*, 1999 WL 696082, *9, 1999 US Dist LEXIS 22642, *30 [ND Cal 1999], *affd* 249 F3d 1087 [9th Cir 2001].)

The NYAG's goal of recovering damages against Greenberg and Smith on behalf of private investors without having to show scienter is in direct conflict with federal law, which requires such proof in actions involving allegations of fraud. (*See e.g. Marcus v AT&T Corp.*, 138 F3d 46 [2d Cir 1998].) This would allow the NYAG to recover damages on behalf of private investors on a quantum of proof significantly lower than under federal law. "The prospect is raised, then, of parallel class actions proceeding in state and federal court, with different standards governing claims asserted on identical facts. That prospect, which exists to some extent in this very case, squarely conflicts with the congressional preference for 'national standards for securities class action lawsuits involving nationally traded securities.'" (*Merrill Lynch, Pierce, Fenner & Smith Inc. v Dabit*, 547 US 71, 86-87 [2006] [citation omitted]; *accord Guice v Charles Schwab & Co.*, 89 NY2d at 48.)

The defendants contend that this direct conflict could only be obviated if requirements of scienter and reliance were imposed with respect to claims seeking the recovery of monetary damages on behalf of private shareholders under the Martin Act and Executive Law. I agree and would reverse on this ground.

Unfortunately, merely holding the NYAG to a higher standard of proof for the claims asserted in this case will not render the

NYAG's prosecution more viable. We have repeatedly held that there are limitations on the power of the NYAG to prosecute claims for money damages on behalf of private entities. Our decision in *People v Grasso* (54 AD3d 180 [1st Dept 2008]), is instructive in this regard. In *Grasso*, we rejected the NYAG's continued prosecution of claims made on behalf of an entity that had altered its status from a not-for-profit corporation to a for-profit entity. "The Attorney General's continued prosecution of these causes of action . . . vindicates no public purpose." (54 AD3d at 196, citing *People v Ingersoll*, 58 NY 1 [1874]; *People v Lowe*, 117 NY 175 [1889].) Our reliance on *Ingersoll* has particular significance for this case. In *Ingersoll*, the NYAG attempted to recover money for a municipal corporation from certain defendants. The Court rejected the NYAG's parens patriae argument: "It is not in terms averred that the money, in any legal sense or in equity and good conscience, belonged to the [State] . . . , or that the wrong was perpetrated directly against the State or the people of the State, that is, the whole State as a legal entity, and the whole body of the people . . . The title to and ownership of the money sought to be recovered must determine the right of action, and if the money did not belong to the State, but did belong to some other body having capacity to sue, this action cannot be maintained." (58 NY at 12-13; *see New York v Seneci*, 817 F2d 1015 [2d Cir 1987].)

In my view, private shareholders who have cause to complain have no need of the NYAG to protect their rights. There simply is no wrong committed "directly against the State or the people of the State" as required by *Ingersoll*, *Lowe* and *Grasso*. Indeed, a class of shareholders has actively litigated claims against AIG in a consolidated securities class action. This action has resulted in a settlement in excess of $1 billion with a contribution of over $100 million from Greenberg and Smith. (*See In re American Intl. Group Sec. Litig.*, No. 1:04 CV 08141 [SD NY 2004].) The NYAG's use of the Martin Act and the Executive Law on behalf of private shareholders should be summarily rejected for the same reasons that we rejected the NYAG's efforts under the Not-For-Profit Corporations Law in *Grasso*.

Even if the action is not preempted by federal law, or precluded by the State Constitution, the motion court erred in not awarding the defendants summary judgment on the Gen Re Transaction claims. It is beyond dispute that the party moving for summary judgment must make out a prima facie showing of entitlement to judgment as a matter of law. (*Alvarez v Prospect Hosp.*, 68 NY2d 320 [1986].) Once the movant has made out a prima facie entitlement to summary judgment, a party opposing

the motion must submit proof in admissible form demonstrating a genuine issue of material fact or proffer a reasonable excuse for the failure to do so. (*Alvarez,* 68 NY2d at 324; *see Grasso v Angerami,* 79 NY2d 813 [1991]; *Zuckerman v City of New York,* 49 NY2d 557, 562 [1980]; *Friends of Animals v Associated Fur Mfrs.,* 46 NY2d 1065, 1068 [1979]; *Vasquez v Christian Herald Assn.,* 186 AD2d 467, 468 [1st Dept 1992], *lv dismissed* 81 NY2d 783 [1993].)

Greenberg and the Gen Re Transaction

In order to hold Greenberg liable for fraud in connection with the Gen Re Transaction, the NYAG was obligated to establish that Greenberg either participated in or had knowledge of the fraud itself. In my view, New York law clearly provides that a corporate officer's knowledge of just the transaction itself is insufficient. (*Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31, 44 [1980] [citations omitted] ["As a general proposition, corporate officers and directors are not liable for fraud unless they personally participate in the misrepresentation or have actual knowledge of it . . . Mere negligent failure to acquire knowledge of the falsehood is insufficient"]; *see Polonetsky v Better Homes Depot,* 97 NY2d 46 [2001]; *People v Apple Health & Sports Clubs,* 80 NY2d 803 [1992].)

The NYAG's theory is that the Gen Re Transaction was fraudulent because it had "no transfer of risk" and thus could not have been carried as insurance under generally accepted accounting principles. Even if that contention is correct, the NYAG simply offers no admissible evidence to rebut Greenberg's prima facie showing that Greenberg did not know that at the time AIG entered into the Gen Re LPT, the LPT did not transfer sufficient risk to be properly accounted for as a finite reinsurance LPT. The only proof of record that is admissible establishes that Greenberg had knowledge of the transaction, a matter that Greenberg does not dispute, but not knowledge of any fraud. More importantly, the NYAG also failed to offer any admissible evidence that the transaction was without risk. The only evidence put forth by the NYAG on this aspect was AIG's 2005 press release and its Restatement.

Defendant Greenberg contends, and I agree, that the Restatement is nothing more than inadmissible hearsay. There is no evidence of record as to how the Restatement was created, how the facts that it was purportedly based on were established, or even that it was created from evidence generally considered reliable. Most significantly, it was issued after Greenberg left AIG and at a time when then Attorney General Spitzer was threatening AIG with criminal prosecution. Similarly, the press

release has absolutely no probative value, and, just as any newspaper article based on that press release, would be inadmissible hearsay.

The only remaining evidence relied on by the NYAG and accepted by the motion court either contravenes CPLR 4517 (a), or is simply inadmissible hearsay. No court in New York has ever allowed hearsay to be sufficient to defeat a summary judgment motion where that hearsay evidence cannot ultimately be converted to admissible evidence at trial.

In my view the reason for this is elementary. There would be no reason to deny summary judgment to a party where the only evidence in opposition to the motion could never be admitted at a subsequent trial. The motion court failed to elucidate how the testimony from the Hartford criminal trial, with its now reversed convictions, would be admissible in a trial of this action. Moreover, when pressed at oral argument on appeal, the NYAG was similarly bereft of authority on this critical issue for the AG's case.

The record reflects that the motion court and the NYAG relied on the Hartford trial judge's opinion on matters at issue as well as the trial testimony of AIG personnel who were either not deposed in this case, or if deposed, no mention was made of the EBT testimony. Furthermore, as noted above, the convictions were ultimately vacated.

The NYAG and the motion court relied on testimony that will always remain inadmissible: (1) the Hartford trial judge's rulings on issues of, inter alia, the credibility of Napier's testimony in the Hartford trial, and as to the damage to AIG investors; (2) the testimony of John Houldsworth in the Hartford trial, who was not deposed in the instant case; (3) the testimony of Charlene Hamrah (the director of AIG's investor relations department) in the Hartford trial and not her EBT testimony; and (4) three other employees of AIG who also testified in the criminal trial.

Equally disturbing is the motion court's reliance on AIG's settlement with the Securities and Exchange Commission and the NYAG as well as Gen Re's settlement with the SEC and the United States Department of Justice. Again, no authority exists to allow the introduction of these settlements, in which the defendants took no role, as evidence in opposition to the motion. Finally, and in my view, astonishingly, the motion court even considered a book written by a former AIG employee when deciding what defendant Greenberg knew about Milton's actions.

None of the above-described "evidence" relied on by the mo-

tion court is rendered admissible through invocation of the co-conspirator exception. In *People v Sanders* (56 NY2d 51 [1982]), the Court was faced with the question of whether certain recorded conversations with a person deceased at the time of trial were admissible against the defendant. The Court reviewed the extent of the co-conspirator exception to the hearsay rule and concluded by holding that, "the People must establish, by prima facie proof, the existence of a conspiracy between the declarant and the defendant 'without recourse to the declarations sought to be introduced.'" (56 NY2d at 62, quoting *People v Salko*, 47 NY2d 230, 238 [1979].) In my view, none of the evidence cited by the court below was nonhearsay, independent evidence of the existence of a conspiracy.

On appeal, the NYAG contends that "Greenberg's own testimony is sufficient to establish a prima facie case of conspiracy." This assertion is wholly belied by the record. Greenberg testified repeatedly that his understanding of the Gen Re Transaction was that it was a valid, and thus lawful, LPT. To overcome this deficiency in proof, the motion court relied on Napier's Hartford criminal trial testimony that Greenberg agreed to a no risk deal. Unfortunately for this reasoning, Napier also testified that he never spoke with Greenberg, was himself a participant in the transaction, and based his assertions on what he heard from third parties. Once again, none of this testimony satisfies any exception to the hearsay rule. Therefore, Napier's testimony in the Hartford criminal trial cannot, by definition, satisfy the *Sanders* requirement of nonhearsay independent evidence. Finally, in reversing the convictions, the Second Circuit cautioned the government over the allegations that Napier perjured himself: "No doubt it is dangerous for prosecutors to ignore serious red flags that a witness is lying, and the government will doubtless approach Napier's revised recollections with a more skeptical eye on remand." (*United States v Ferguson*, 676 F3d 260, 283 [2011]). WL 6351862, *14, 2011 US App LEXIS 26115, *48 [2011].) Such testimony surely cannot serve to make the NYAG's prima facie burden.

## Smith and the Gen Re Transaction

The NYAG's utter failure to submit admissible evidence in opposition to Greenberg's summary judgment motion is less egregious than its failure to submit such in opposing Smith's motion. No witness testified that Smith was responsible for accounting for the Gen Re Transaction. Indeed, no witness testified that they even spoke with Smith about the transaction. While Smith, as AIG's CFO, may have had involvement in

certain transactions between Hartford Steam Boiler and Gen Re, Smith unequivocally testified in his EBT that he was not aware of either the details of the Gen Re Transaction or that any premium was returned to Gen Re. Smith testified repeatedly that he was told that the transaction involved $500 million in premium and a potential exposure of $600 million. In his view, the transaction involved $100 million in risk to AIG. The reasons set forth above for rejecting any of the Hartford trial testimony as evidence against Greenberg apply equally to Smith. The testimony will always be inadmissible in this case and can never be used to defeat Smith's motion.

Greenberg, Smith, and the CAPCO Transaction

The majority contends that the evidence put forward by the NYAG shows that the "defendants actively participated in the CAPCO [T]ransaction with knowledge of the deceptive purpose it was intended to achieve." This view of the evidence is only possible if we disregard all of the accepted principles applicable to summary judgment motions.

It is hornbook law that "issue finding and not issue resolution is a court's proper function on a motion for summary judgment." (*Cruz v American Export Lines*, 67 NY2d 1, 13 [1986], *cert denied* 476 US 1170 [1986]; *Shapiro v Boulevard Hous. Corp.*, 70 AD3d 474, 475 [1st Dept 2010].) Furthermore, the court is required to draw all inferences in favor of the nonmovant. (*Id.*; *People v Grasso*, 50 AD3d 535, 544 [1st Dept 2008].) Finally, in the context of summary judgment, the court is not to assess the credibility of the assertions of each side, but rather decide if the movant who has the burden has established "his entitlement to summary judgment as a matter of law." (*Ferrante v American Lung Assn.*, 90 NY2d 623, 631 [1997]; *Adam v Cutner & Rathkopf*, 238 AD2d 234 [1st Dept 1997].)

In my view the motion court and the majority have ignored every precept set out above to come to the conclusion that the defendants intended the CAPCO Transaction to be a mere deception. Initially, there is absolutely no record support for the motion court or the NYAG to conclude that the conversion of underwriting losses to capital losses is prima facie improper.

The defendants established that Greenberg repeatedly testified in his EBT that he understood it was permissible to "convert underwriting [losses] properly into investment losses, and that [it] could only be done if [. . .] checked by the regulatory, legal, and accounting people." ("Umansky . . . said subject to getting approval from the regulatory side, the legal side, the accounting side . . . [t]here was nothing improper about converting underwriting losses to investment losses".) The de-

fendants also submitted unrebutted expert opinion evidence establishing that a "change from an underwriting loss to a capital loss is not, in and of itself, improper pursuant to GAAP." The NYAG failed to submit any countervailing evidence. Indeed, the NYAG failed to proffer any expert testimony at all in reply to Greenberg's opposition to the motion. Obviously, the credibility of the nonmovant defendants' expert submitted in opposition cannot be resolved adversely to Greenberg, nor his opinions completely ignored, by the motion court. This is especially true when the NYAG submitted no contravening proof. (*Cf. Bradley v Soundview Healthcenter*, 4 AD3d 194 [1st Dept 2004] ["Conflicting expert affidavits raise issues of fact and credibility that cannot be resolved on a motion for summary judgment"].)

Greenberg's understanding of the merits of the transaction in theory was corroborated by the numerous professionals, both lawyers and accountants, who ultimately structured the CAPCO Transaction for AIG. None of these professionals raised any concerns regarding the propriety of exiting the auto-warranty business through a transaction that also converted the underwriting losses to capital losses. Indeed, the record is unequivocal that at least eight AIG attorneys, including Ernest Patrikis, AIG's General Counsel, and Ken Harkins, the General Counsel of AIG's Domestic Brokerage Group, which was responsible for National Union, understood that the CAPCO Transaction converted underwriting losses to capital losses. Numerous AIG accountants, including reinsurance accounting experts, also understood that the CAPCO Transaction converted underwriting losses to investment losses. Last, but not least, AIG's independent auditors, PricewaterhouseCoopers, also were aware of the CAPCO Transaction.

Greenberg accurately points out that none of these professionals raised any concerns that such a transaction would be per se improper because it resulted in the conversion of underwriting losses to capital losses. Several attorneys involved testified they were familiar with similar transactions. At the very least, where the conduct is consistent with industry practice, summary judgment is "particularly" inappropriate. (*State of New York v General Motors Corp.*, 48 NY2d 836, 838 [1979].)

In sum, the record is directly contrary to the majority's and the motion court's inference that converting an underwriting loss to a capital loss is, per se, a deceptive or wrongful act. The further inference that Greenberg must, therefore, have known that the CAPCO Transaction was deceptive is also in direct

conflict with the record. Finally, even if I were to agree that such inferences were arguably "reasonable," it would nonetheless be impermissible to grant summary judgment to the moving party upon reasonable but not "inescapable" inferences. (*Liberty Ins. Underwriters Inc. v Corpina Piergrossi Overzat & Klar LLP*, 78 AD3d 602, 605 [1st Dept 2010].)

I concur with the majority that if the claims are not preempted by federal law, the motion court erred nonetheless because issues of fact exist solely on the question of the materiality of the CAPCO Transaction. **[Prior Case History: 2010 NY Slip Op 33216(U).]**